STATE OF NEBRASKA, APPELLEE, V. MICHAEL PRIM, APPELLANT.

267 N. W. 2d 193

Filed June 28, 1978. No. 41621.

Thomas M. Kenney, Douglas County Public Defender, and Bennett G. Hornstein, for appellant.

Paul L. Douglas, Attorney General, and Harold Mosher, for appellee.

Heard before WHITE, C. J., BOSLAUGH, McCOWN,

CLINTON, BRODKEY, and WHITE, JJ., and HASTINGS, District Judge.

CLINTON, J.

Defendant Michael Prim was charged with first degree murder, having shot and killed Harry John Dieter during the commission of a robbery at the victim's gas station in Omaha on February 9, 1977. Upon trial by jury, the defendant was convicted and sentenced to life imprisonment. On this appeal defendant assigns two errors: (1) That the trial court erred in failing to suppress the defendant's confessions, which are claimed to have not been voluntarily and intelligently made; and (2) that the court erred in failing to give NJI No. 14.31, submitting to the jury the question of whether, by reason of being under the influence of drugs at the time of the offense charged, he was incapable of having criminal intent, i.e., in this case to rob or kill. We affirm.

Before trial the defendant offered a motion requesting that the court suppress the confessions and incriminating statements which the defendant made to interrogating officers of the homicide unit of the Omaha police division. The defendant argues that these statements were involuntarily made because at the time he was suffering from withdrawal symptoms as a heroin addict and from lack of sleep, and that the statements were induced in part by police deception.

In a criminal trial a confession of guilt is not competent as evidence unless first shown to have been voluntarily made. State v. Longmore, 178 Neb. 509, 134 N. W. 2d 66.

After the pretrial suppression hearings, the trial court found that the confessions were voluntarily and intelligently made and overruled the motion to suppress, and the confessions were admitted at trial. A finding of the trial court that statements or confessions were intelligently and voluntarily made will

not be set aside on appeal unless the finding is clearly erroneous. State v. Medina, 189 Neb. 765, 204 N. W. 2d 785; State v. Van Ackeren, 194 Neb. 650, 235 N. W. 2d 210; State v. McDonald, 195 Neb. 625, 240 N. W. 2d 8.

The evidentiary use of a defendant's incriminating statements violates due process if it is shown that the statements obtained are not the product of a rational intellect and a free will. The determination of the issue necessitates consideration of the totality of the circumstances surrounding the giving of the statement or confession. State v. Russell, 194 Neb. 64, 230 N. W. 2d 196; Frazier v. Cupp, 394 U. S. 731, 89 S. Ct. 1420, 22 L. Ed. 2d 684.

The evidence presented at the suppression hearing presents the following picture. The day following the robbery and slaying the defendant induced his brother, Reginald T. Prim, and an acquaintance to drive him to Colorado Springs, Colorado, on the pretense that he had to leave Omaha because he was in danger of being killed because he had defrauded a drug dealer. They drove all night to reach Colorado Springs, arriving there early in the morning. Shortly after their arrival, their Colorado host called the defendant's grandmother in Omaha to report their safe arrival. Through this conversation the host and the defendant's brother, Reginald, were first made aware that the defendant and Reginald were wanted for the homicide. The brother proclaimed his innocence. The defendant admitted his guilt. He was then advised by his host and his brother to return to Omaha and surrender to the police. The defendant, however, was apprehensive that he might be stopped on the return trip and perhaps shot by law officers in the process of being apprehended.

Arrangements were then made by telephone with an assistant chief of the Omaha police division, who was not involved in the investigation, so that the parties could return without fear of apprehension before arriv-

ing, that is, they were assured that no all-points bulletin had been issued for them. It was agreed that upon their return they would contact the assistant chief and surrender to him. The defendant and his companions immediately started the return trip, driving all day and reaching Omaha about 10 p.m., on February 11, 1977. Defendant did not participate in the driving in either direction. Upon their arrival, defendant's brother called the assistant chief and informed him of their whereabouts. The assistant chief and another officer then went to that location and made the arrest.

During the return trip to Omaha, the brothers concocted a version of the robbery which made the defendant seem less culpable, i.e., he had only been the driver of the robbery car and the actual killing had been done by a fictitious friend without the defendant's foreknowledge and that that friend had fled the state.

Through the testimony of the defendant's brother, there was evidence that the defendant was a heroin addict; that he may have had a fix before leaving Colorado; and that after arriving in Omaha the defendant consumed part of a pint of gin and smoked some marijuana, all of which did "nothing for him." The brother testified that he believed at the time of the arrest the defendant was having withdrawal symptoms and stated that he so informed the arresting officers. This the arresting officers denied. These officers noted nothing unusual about the defendant. They did not interrogate him, but turned him over to officers of the homicide unit.

Before interrogating the defendant the officers of the homicide unit gave the defendant the warnings required by Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, and the defendant waived his rights not to make a statement and to the presence of a lawyer during the questioning. It is not disputed that the warnings were given and the defendant gave affirmative answers to the questions and waivers.

At this time, about 10:50 p.m., on February 11, 1977, the defendant was questioned for about 20 minutes and told the false version of the slaying and robbery which had been agreed upon. Immediately after this interrogation the officers questioned Reginald and then again interviewed the defendant for about 30 minutes. This was about 12:30 a.m., on February 12, 1977. Defendant related essentially the same story he had given earlier. The officers testified that during none of these interviews did the defendant make any complaints of illness or ask for medical attention. His conversation was rational and he appeared to know what he was doing. After this the officers and the defendant went to the scene of the crime where he gave them additional information. At about 4:35 a.m., in the presence of the friend who had accompanied the brothers to Colorado, defendant was again interrogated. The friend told the defendant to tell the truth. The defendant then told him to leave the room. The officers then told the defendant that his brother had confessed and when he stated that he did not believe them, they played a portion of the taped statement taken from the brother which seemed to admit involvement in the robbery and which implicated the defendant in the crime. The brother, in fact, had not admitted any participation. The defendant then agreed to give a statement.

At 4:57 a.m., the defendant was readvised of his Miranda rights and waived them. He then gave a tape-recorded confession of his direct involvement in the crime. Following this confession the defendant was booked for first degree murder and responded negatively when asked if he was sick, injured, or under doctor's care or medication.

The principal interrogating officer testified that, in his opinion, when the tape was played the defendant was having mild withdrawal symptoms, sniffing, and

complaining of being cold although the room was warm.

On February 14, 1977, the gun had been found. The defendant, after again receiving Miranda warnings and answering the questions affirmatively, identified the gun as the weapon used to commit the robbery and murder. The evidence indicates that the weapon belonged to Reginald and that the defendant had taken it without Reginald's knowledge or permission.

A psychiatrist, experienced in the treatment of drug addiction, was called by the State as an expert witness. After being informed in a hypothetical question of the circumstances surrounding the confession of February 12, he gave his opinion that the defendant was having Stage 1 withdrawal symptoms (there being three stages, 0, 1, and 2), that such symptoms appeared to be mild and were not medically serious, and that in his opinion the defendant's confession was free and voluntary.

The defendant did not testify. The arresting and interrogating officers did not at any time note any sign of defendant's intoxication from the claimed consumption of gin and the smoking of marijuana. There was no evidence that any threats were made, or inducements offered, to gain the confessions.

Considering the totality of the circumstances, we cannot say that the findings of the trial judge that the confessions were freely, intelligently, and voluntarily made were clearly erroneous.

In his second assignment of error, the defendant claims that the court erred in failing to instruct the jury on the defense of drug intoxication. The defendant did not request such instruction. However, it is the duty of the court, upon request of the accused, to instruct the jury upon any valid defense which the evidence supports. State v. Stewart, 197 Neb. 497, 250 N. W. 2d 849. The court, however, is not required to give instructions where there is not

sufficient evidence to prove the facts claimed. Voluntary intoxication is no justification or excuse for crime unless it is so excessive that the person is wholly deprived of reason so as to prevent the requisite criminal intent. See NJI No. 14.31 and authorities there cited. The only mention of defendant's alleged drug intoxication at the time of the murder-robbery was Officer O'Donnell's testimony on cross-examination wherein he said: "Michael at no time complained of any symptoms for heroin, but he did state during the statement that he was high on heroin when he did the murder-robbery." The record is devoid of any evidence which would support a claim of intoxication to the degree that the defendant was wholly deprived of reason so that he was deprived of the capability of intent to rob. Absent such evidence, the record did not justify the submission of an instruction on the defense of drug intoxication. No specific intent to kill, of course, was required as that element is supplied by statutory definition.

AFFIRMED.