STATE OF NEBRASKA, APPELLEE, V. RANDOLPH K. REEVES, APPELLANT.

344 N.W.2d 433

Filed January 20, 1984. No. 81-706.

Dennis R. Keefe, Lancaster County Public Defender, and Richard L. Goos, for appellant.

Paul L. Douglas, Attorney General, and J. Kirk Brown, for appellee.

KRIVOSHA, C.J., BOSLAUGH, McCOWN, WHITE, HASTINGS, CAPORALE, and SHANAHAN, JJ.

PER CURIAM.

Randolph K. Reeves pled not guilty and not guilty by reason of insanity to each of two counts of felony murder in the commission or attempted commission of a first degree sexual assault. The jury found him guilty on both counts, and a three-judge panel sentenced him to death on each of the two murder counts. He appeals.

A statement of the facts is necessary. At 3:46 a.m. on March 29, 1980, Janet L. Mesner made a 911 emergency call and reported that she had been stabbed, that she thought a friend was dead from stab wounds, and that her address was 3319 South 46th Street, Lincoln, Nebraska. This address was a Religious Society of Friends meetinghouse, a place in which those of the Quaker religious faith meet. Since 1977, Janet Mesner had been a live-in caretaker of the premises. Victoria L. Lamm and her 2-year-old daughter were visitors.

Lincoln police officer Steven R. Imes responded to the call and, upon his arrival, found Janet Mesner lying on the floor in the rear of the house and attended by two or three firemen. She had seven stab wounds to her chest. When Officer Imes asked who had stabbed her, Janet replied, "Randy Reeves." The officer asked if there was anyone else still in the residence. Janet replied, "My friend, I think she's dead, and a little girl."

Officer Imes then went upstairs and found the partially clad body of Victoria Lamm lying face up in the south bedroom. There was a fatal stab wound in her chest, which penetrated the main pulmonary artery of the heart, and a stab wound in her midline, which pierced the liver.

The disordered condition of the room in which Victoria's body was found indicated that a violent struggle had taken place. The floor was covered with blood, and several articles of women's bedclothes, a piece of luggage, and papers were strewn about the room. A lamp and sewing machine were overturned, and the telephone was ripped from its wall socket. A billfold containing identification of the defendant was found near Victoria Lamm's foot. In the middle of the blood-soaked sheets on the bed, underwear, later identified as belonging to the defendant, was found. Later examination of the underwear revealed the presence of spermatozoal secretions of the defendant's blood type. Next to the bed was one of the defendant's socks. A serrated kitchen knife with Janet Mesner's blood on it was found near the bed.

When Officer Imes was investigating the bedroom, Victoria's 2-year-old daughter walked from the north upstairs bedroom. She was unharmed.

On the main floor the police found an open window in a small room adjoining the kitchen. On the outside of the house below the open window was a garbage can turned upside down. Next to the garbage can were two shoe prints in the mud; inside the

house was a shoe print in the downstairs den—all of which had the same characteristics as the shoes the defendant was wearing at the time of his arrest.

Janet Mesner was taken to Lincoln General Hospital in Lincoln where she was attended to by Drs. Chester Paul and Denise Capek. When Dr. Paul first saw Janet, she was in shock and emergency medical procedures were being undertaken.

Officer Richard J. Lutz, who had been dispatched to the emergency room, was present when Janet arrived. Janet told the officer that she had been "raped and stabbed" by Randy Reeves, and she gave his description. Janet did not know how Randy gained entrance to the residence, but she knew he was alone. She referred to the defendant as her cousin, and repeatedly stated, "I don't know why Randy would do such a thing to me or to my girl friend." Despite the efforts made on her behalf, Janet died at approximately 5:55 a.m.

The evidence at trial established that the defendant was adopted as a child by Donald and Barbara Reeves, who farmed near Central City, Nebraska. The Reeves family was related to the Mesner family. In addition to the interfamily relationship, several members of both families practiced the Quaker religious faith. The defendant and Janet were friends, and he had visited her house on prior occasions.

In the events leading up to the killings, the defendant and some of his friends were working a temporary construction job near Hastings, Nebraska. Inclement weather forced cancellation of the work scheduled for March 28, 1980, so the defendant and his coworkers, Ronald Barzydlow and Ray Schmidt, went to a bar in Hastings and began drinking at about 9 a.m. Defendant and his friends arrived at Ray Schmidt's house in Lincoln, Nebraska, at approximately 6 p.m. While at Schmidt's house, the defendant consumed more beer and informed Barzydlow and Schmidt about a party at the home of

another of the defendant's friends in Lincoln. Schmidt decided not to attend, but told the defendant that he could stay at his house after the party.

At the party the defendant consumed more alcohol and ingested two or three buttons of peyote, a hallucinatory drug. Mescaline is the main active ingredient of this drug. Several witnesses at the party noted that the defendant was having trouble concentrating and that he told a false story about beating up a friend of his. Mrs. Susan Blackwell, who was also present at the party, noticed that the defendant's eyes were red and glassy; at one point he pinched her and nudged her with his foot.

The defendant and Barzydlow were the last to leave the party at approximately 1:30 a.m. Barzydlow, who had consumed alcohol with the defendant on previous occasions, testified that the defendant was "drunker than I'd ever seen him . . . . He appeared to me to be in a stupor." On the ride home the defendant told Barzydlow that he wanted to visit a girl. After driving for a short time the defendant was unable to direct Barzydlow to his destination, so he requested to be let out of the car near 40th and Calvert Streets in Lincoln. Barzydlow complied with the request.

Based on the description Janet Mesner gave to the Lincoln police, Officer Bruce M. Bell arrested the defendant at 4:45 a.m. as he attempted to cross O Street between 39th and 40th Streets. The *Miranda* warnings were read, and the defendant answered in the affirmative to all of the questions.

At the time of his arrest the defendant's eyes were red, and he had blood on his hands and outer clothing. In addition, the fly of his trousers was open and his penis was exposed. Later tests determined the blood on defendant's body, including his penis and his clothes, was of the same type as Janet Mesner's blood.

The defendant was taken to the Lincoln police station and placed in an interview room. After again

being informed of his *Miranda* rights, the defendant was interviewed on three separate occasions. The third interview, which Assistant Chief of Police Roger LaPage and Lancaster County Attorney Ron Lahners conducted, was the most detailed. The defendant related the events that occurred before the murders. He also said that although he could not remember much about the murders, he could remember having stabbed and raped Janet Mesner.

Following the third interview, the defendant was administered a breath-alcohol test at 6:39 a.m. The results showed a blood alcohol content of .149 percent at that time.

At 10:30 a.m. the defendant was taken to Lincoln General Hospital in order to obtain urine, blood, saliva, and penile samples. The defendant's urine and blood samples tested by state chemists confirmed the presence of mescaline. A forensic serologist was unable to find the presence of semen from either the penile swabs of the defendant or the vaginal swabs of either of the two deceased women. However, the acid phosphate level of Janet Mesner's vaginal sample was consistent with intercourse having occurred.

The defendant at trial maintained that he was not guilty of the felony murder counts because of his inability to form the requisite intent needed for a first degree sexual assault or a first degree attempted sexual assault. Alternatively, in the event the jury found that he could entertain the intent to commit the sexual assault or attempted sexual assault, he pled not guilty by reason of insanity.

On the issue of defendant's mental capacity, the defense called several expert witnesses. A psychologist was not able to pinpoint the specific condition the defendant was suffering from, but did conclude that because of his amnesia concerning the stabbings, the closest category that would fit was a disassociative reaction. He concluded that, based upon the evidence presented, the defendant did not

have the capacity to know what he was doing or to understand the nature or quality of his acts. He also concluded that at the time of the stabbings the defendant did not know right from wrong. A psychopharmacologist also testified and reached the same conclusions as the psychologist regarding the defendant's sanity at the time of the incident. He testified that in combination with alcohol, mescaline produces a synergistic effect, or a result which is greater than the sum of the two parts. He stated that while alcohol tempers the hallucinatory effects of the mescaline, it further expands the feeling of being out of touch with reality. All but a slight portion of the testimony regarding the defendant's insanity or inability to form the requisite intent at the time of the crimes was based upon his consumption of peyote and alcohol. The defendant was diagnosed as not having any specific mental disease or defect. He had an above average IQ of 115 and had attended a year of college before dropping out.

The psychiatrists for the prosecution testified that the defendant did not suffer from a personality disorder or mental deficiency and was legally sane at the time of the stabbings and assault. The psychopharmacologist who testified for the State disagreed with the defendant's expert. He stated that alcohol would temper or depress any effects of mescaline when taken together. He further testified that the defendant, at the time he committed the crimes, had the mental capacity to know and understand the nature of his acts, had the mental capacity to know right from wrong, and knew such acts were wrong and would deserve punishment.

At the conclusion of the trial the jury found the defendant guilty on both counts. A three-judge panel sentenced him to death on each of the two murder counts, and this appeal followed.

The defendant contends that the trial court denied him a fair trial and due process of law by not disqualifying the prosecuting county attorney, Ron

Lahners, by virtue of the fact that he had interviewed the defendant shortly after the killings and was therefore a necessary witness for the defense on the issue of the defendant's sanity.

As a general rule, a prosecutor should withdraw from a case when he testifies for the prosecution. *People v. Superior Court, Cty. of San Bernardino*, 86 Cal. App. 3d 180, 150 Cal. Rptr. 156 (1978); *State v. King*, 256 N.W.2d 1 (Iowa 1977); *State v. Mercer*, ____ Mont. ____, 625 P.2d 44 (1981). However, the general rule does not apply when the defense calls the prosecutor as a witness. *People v. Arabadjis*, 93 Misc. 2d 826, 403 N.Y.S.2d 674 (1978); see, generally, Annot., 54 A.L.R.3d 100 (1974).

The record in this case supports the trial court's determination that it was not necessary to disqualify Mr. Lahners in order to assure the defendant a fair trial. The defense, not the State, called Mr. Lahners as a witness. Apparently, the defense believed this testimony would aid them in the insanity defense, in that during the interview which Mr. Lahners and Assistant Chief of Police Roger LaPage conducted, defendant was unable or unwilling to disclose many of the details surrounding the crimes. We find that there was nothing in the prosecutor's testimony that substantiated the defendant's contention that he was insane at the time of the killings. The prosecutor at all times prior to and during trial maintained that the defendant was in full possession of his mental capacity and not suffering from a mental disease or defect. The prosecutor's testimony directly refuted the defendant's claim that he was insane at the time of the killings.

Even if the events concerning the third interview were arguably relevant, there were other methods of introduction available to the defense. The assistant chief of police or Lt. Don L. Wilkins was present during the interview and there was no showing by the defense that they were unable to testify concerning this interview. In addition, the defend-

ant did not contest the accuracy of the transcript of the interview. The defendant made a previous motion to have any references to a polygraph statement stricken from the interview transcript and tape recording. The motion was sustained. When the trial judge offered to consider doing the same for the prosecutor's references on the transcript and tape recordings as to the defendant's untruthfulness, counsel for the defendant declined to make such a motion.

The defendant would have this court find prejudicial error because of a defense tactic that may have backfired. This we cannot do.

In *Riboni v. Dist. Ct.*, 196 Colo. 272, 586 P.2d 9 (1978), the defense intended to call the prosecutor because of his knowledge of a possible inconsistent statement of a prosecution witness and an on-scene vehicle accident inspection. The Colorado Supreme Court held that the defense could not disqualify the prosecutor and require the appointment of a special prosecutor absent a showing that the testimony was necessary and not merely cumulative. In so holding the Colorado court stated at 274-75, 586 P.2d at 11:

"[T]here may be significant prejudice to the People if [the prosecutor] is precluded from participating in the prosecution. It appears that he has been specially trained to handle vehicular homicide cases and that it is a normal part of his case preparation routine to participate in an on-the-scene investigation of the accident whenever possible. Necessarily this would make him a witness to some aspect of every such case. Were it possible to disqualify him merely because he had obtained some factual knowledge of the case by first-hand investigation, he, and the People, would be penalized for having sought excellence in case preparation.

"Every prosecutor who participates directly in interviewing and otherwise investigating his cases subjects himself to the risk of being called as a witness. But to allow opposing counsel the unfettered

option of removing any prosecutor who has personal knowledge of any material fact in the case might well result in restricting the prosecution function of the ill-prepared. . . .

"Our justice system has encouraged trial lawyers to participate directly in case preparation, including interviewing witnesses. Obviously this system could not function efficiently if every prosecutor who has interviewed a witness could be disqualified from participating in the trial merely because there is a possibility he may be called as a witness."

We find the language of the *Riboni* case applicable here. There was evidence at trial that Mr. Lahners was the first to be called whenever any type of homicide occurred in which his office was involved. Upon notification of the homicide he would routinely go to the crime scene and make certain that the proper procedures were followed with the collection of evidence. He would then follow up on any details of the crime, which in this case involved a trip to the hospital to check on the victim and an interview with the defendant after his arrest. It is ludicrous to suggest that a defendant can disqualify a prosecutor every time he becomes personally familiar with the facts of a case. "[T]he Court will not allow defendant's counsel to raise the possibility of calling the prosecutor as a witness merely to disqualify him from the trial of the case." *People v. Arabadjis*, 93 Misc. 2d 826, 403 N.Y.S.2d 674, 676 (1978).

Due to the facts that the defendant had given statements to the police on at least two prior occasions, that other people were also present during the third interview and could have testified, that the trial court offered to consider a motion to delete the portions of the interview which defendant contends were prejudicial, that the defense, not the State, called Mr. Lahners as a witness, and that his testimony at trial was for the most part cumulative, we find no showing that the prosecutor as a witness infringed upon the defendant's right to a fair trial.

The defendant's tactics from the beginning appear to have been based upon a desire to either disqualify Mr. Lahners, the person most familiar with and competent to try the case, or to predicate error upon his remaining in the role of prosecutor.

The defendant contends that the trial court erred in refusing to submit jury instructions on lesser-included offenses of second degree murder and manslaughter.

The critical difference between a felony murder charge and a regular first degree murder charge with respect to intent has been addressed by this court on a number of previous occasions. The turpitude involved in the sexual assault takes the place of intent to kill or premeditated malice, and the purpose to kill is conclusively presumed from the criminal intention required for sexual assault. *State v. Hubbard*, 211 Neb. 531, 319 N.W.2d 116 (1982); *State v. Bradley*, 210 Neb. 882, 317 N.W.2d 99 (1982); *State v. Montgomery*, 191 Neb. 470, 215 N.W.2d 881 (1974).

In *State v. Hubbard*, *supra* at 534, 319 N.W.2d at 118, we stated that "[w]here an information charges a defendant with a killing committed in the perpetration of or attempt to perpetrate one of the specific felonies set out in § 28-303(2), second degree murder and manslaughter are not lesser-included offenses, and it is ordinarily error for the trial court to instruct the jury that it may find the defendant guilty of second degree murder or manslaughter, even though such an instruction is requested." In light of the holdings in the above-cited cases, defendant's contention is without merit.

The defendant next assigns as error the failure of the trial court to instruct the jury as follows: "You must also consider defendant's claimed mental diminished capicity [sic] and take all the evidence into consideration in determining whether defendant had the mental capacity to form any of the specific mental states that are essential elements of murder

in the first degree and sexual assault in the first degree.

"In this respect you must consider all the evidence, or lack of evidence, to determine whether the defendant had such reduced mental capacity (whether caused by mental illness, mental defect, intoxication, mental retardation, or a combination thereof,) that he could not form such mental state.

"If you have a reasonable doubt as to whether defendant was capable of forming such mental state, you must find the absence of such essential element."

In reviewing this assignment we note that it is the duty of the trial court upon request of the accused to instruct the jury upon his theory of the case, if there is evidence to support it. *State v. Stewart*, 197 Neb. 497, 250 N.W.2d 849 (1977). We also note that the trial court retains discretion in the wording of jury instructions.

The overwhelming majority of the defendant's evidence contained in the vast record centered on defendant's lack of requisite intent due to voluntary drug and/or alcohol intoxication and defendant's insanity. Only a minute portion of the evidence touched on defendant's lack of intent due to other factors. The court is not required to give instructions where there is not sufficient evidence to prove the facts claimed. *State v. Scott*, 212 Neb. 625, 324 N.W.2d 670 (1982); *State v. Prim*, 201 Neb. 279, 267 N.W.2d 193 (1978). The trial court did instruct the jury on defendant's theories of lack of intent due to intoxication and insanity. As stated in *State v. Bartholomew*, 212 Neb. 270, 275, 322 N.W.2d 432, 436 (1982): " 'All the instructions must be read together and if the instructions taken as a whole correctly state the law, are not misleading, and adequately cover the issues, there is no prejudicial error.' " We find the jury was properly instructed.

The defendant assigns as error the trial court's refusal to instruct the jury with regard to the conse-

quences of an acquittal by reason of insanity. In *State v. Reitenbaugh*, 204 Neb. 583, 284 N.W.2d 19 (1979), and *State v. Williams*, 205 Neb. 56, 287 N.W.2d 18 (1979), we held that it was not error for the trial court to refuse to instruct a jury in a criminal case of the consequences of a verdict of not guilty by reason of insanity. Our reason for so holding was that, " 'in the absence of some specific statutory provision, a defendant's disposition is not a matter for the jury's concern.' " *Reitenbaugh, supra* at 585, 284 N.W.2d at 20.

Defendant next asserts that the trial court erred in not sustaining his motion for mistrial made at the close of final argument. The motion was based on a statement made by the prosecutor during closing argument. The statement is set forth as follows: "I would also point out to you that when you have listened to defense counsel during the arguments, they have asked you to do something. They have said, 'Couldn't it have happened? Isn't it possible? Isn't there a chance that —' in other words, what they're asking this jury to do is speculate on the evidence. And what I'd ask this jury to do would be to look at the evidence and then apply the evidence to the facts in this case to determine whether or not the elements have been proven. [If] the State doesn't prove this case beyond a reasonable doubt, then the State shouldn't win and this defendant should walk out of this courtroom a free man."

The defendant is correct in asserting that because of his insanity defense the statement made by the prosecutor was not an entirely correct statement of the law. A misstatement of the law, however, in and of itself does not automatically require a new trial. " 'Whether misconduct on the part of a prosecuting attorney is prejudicial to the defendant depends largely upon the facts of each particular case.' " *State v. Ellis*, 208 Neb. 379, 398, 303 N.W.2d 741, 753 (1981). In most instances the impact of a comment such as was made in the instant case de-

pends on the atmosphere at trial. The trial judge is in a much better position than we to measure the atmosphere at trial and gauge the probable impact an improper comment has on the jury. The trial judge expressly considered whether the comment could have been construed by the jury so as to apply to a not guilty by reason of insanity verdict. The trial judge held that, in context, the prosecutor's statement was specific to a verdict of not guilty and, as such, did not mislead the jury.

It has long been the law in this state that remarks of the prosecutor in final summation which do not mislead and unduly influence the jury do not rise to a level sufficient to require the granting of defendant's motion for mistrial. *Argabright v. State*, 62 Neb. 402, 87 N.W. 146 (1901).

Taken in context, the prosecutor's statement was not so prejudicial as to warrant a mistrial. Therefore, we find the trial court did not err in denying defendant's motion for mistrial based upon allegedly improper comments of the prosecutor during summation to the jury.

Defendant next argues that the trial court erred in permitting the prosecution to ask the prospective jurors, on voir dire, questions about their attitudes as to the death penalty. Defendant submits, without any proof, that because of this line of questioning, the jury was inclined to favor conviction.

This court recently addressed this issue in *State v. Lamb*, 213 Neb. 498, 330 N.W.2d 462 (1983), *State v. Scott*, 212 Neb. 625, 324 N.W.2d 670 (1982), and *State v. Anderson and Hochstein*, 207 Neb. 51, 296 N.W.2d 440 (1980), *cert. denied* 450 U.S. 1025, 101 S. Ct. 1731, 68 L. Ed. 2d 219 (1981). In those cases we held that a juror who has indicated an inability to fairly and impartially determine guilt by refusing to subordinate his personal views and obey the law of the state must be excused for cause. See, *State v. Kirby*, 185 Neb. 240, 175 N.W.2d 87 (1970); *Lockett v. Ohio*, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978);

*Witherspoon v. Illinois*, 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968), *reh'g denied* 393 U.S. 898, 89 S. Ct. 67, 21 L. Ed. 2d 186. The questions asked during voir dire in the instant case did not exceed the bounds set forth in the above-cited cases, and, as such, we find no error.

In painting with broad strokes defendant contends that he was denied due process of the law by the sentencing panel because it introduced into evidence and considered defendant's presentence investigation.

Neb. Rev. Stat. § 29-2521 (Reissue 1979) authorizes the trial court to consider and receive any evidence which is deemed probative to sentencing in a capital case.

Neb. Rev. Stat. § 29-2261 (Reissue 1979) authorizes a presentence investigation in felony cases. This statute applies to all cases in which the trial court has discretion in sentencing, but does not make reference to any special procedure in cases of homicide.

Defendant asserts that Neb. Rev. Stat. §§ 29-2519 et seq. (Reissue 1979) set out the exclusive sentencing procedure in homicide cases and that because these statutes do not specifically mandate the use of a presentence investigation, the sentencing panel was in error in doing so. If defendant's interpretation was correct, a trial court could make use of a presentence investigation for a conviction of a Class IV felony such as pandering, but may not consider a presentence investigation after a first degree murder conviction. It is readily apparent that this assignment is without merit. As stated in *State v. Anderson and Hochstein, supra* at 72, 296 N.W.2d at 453: ''[T]he traditional rules of evidence may be relaxed following conviction so that the sentencing authority can receive all information pertinent to the imposition of sentence.'' See, also, *State v. Stranghoener*, 208 Neb. 598, 304 N.W.2d 679 (1981); *State v. Kramer*, 203 Neb. 658, 279 N.W.2d 634 (1979); *State*

*v. Holzapfel,* 192 Neb. 672, 223 N.W.2d 670 (1974).

Defendant's reliance on *Gardner v. Florida,* 430 U.S. 349, 97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977), is misplaced. In *Gardner* a plurality of the Court invalidated a death sentence in which the sentencing court had relied in part on a confidential portion of a presentence report that was not disclosed to the defendant or his counsel, nor included in the record on appeal. The Court did not formulate a "per se" rule of prohibition against the use of the presentence investigation in capital cases. On the contrary, if it appears that the content of the presentence investigation is fully disclosed to the defendant or his counsel so that he has a chance to explain or deny unfavorable information and it is included in the record on appeal, the presentence investigation remains an indispensable and valuable tool in a capital sentencing procedure.

In the instant case the defendant's counsel was questioned and he acknowledged that he had ample time to inspect the entire presentence report, and expressly stated that no additions or corrections were necessary. The panel specifically referred to the presentence investigation on the record whenever the substance of the report was considered material in regard to aggravating or mitigating factors. The accuracy of the statements made by the panel concerning the defendant's prior criminal activity was not contradicted by the defendant or his counsel, nor was the panel asked to provide the defendant an opportunity to challenge the accuracy or materiality of the information.

The defendant's sole objection on the record to the substance of the presentence report is as follows: "I would like to take this opportunity to object to the entire presentence investigation being received in evidence and particularly do I object to that portion of it which includes a polygraph examination. I object to that on the grounds that it's hearsay. The defendant is denied confrontation witnesses in an im-

portant area contrary to his constitutional rights."
The polygraph examination results were contained
within the police reports of the presentence investi-
gation. The only conclusion made by the polygraph
examiner was that he thought "that there are details
concerning this case that Mr. Reeves . . . has not re-
lated to us at this time and that he does specifically
recall these details and does specifically have men-
tal recollection of these facts at this time." Al-
though the opinion of the examiner was not favor-
able, we do not feel that this was the type of infor-
mation that would be decisive in the sentencing
panel's choice between a life and death sentence,
and the polygraph information was not referred to
anywhere in the decision of the panel.

As to the hearsay assignments made by the de-
fendant regarding the presentence report: "By the
very nature of a presentence investigation report, it
is necessary to rely to a great extent upon hearsay
information." *State v. Porter*, 209 Neb. 722, 723, 310
N.W.2d 926, 927 (1981).

As to the defendant's argument that use of the pre-
sentence report denied him the right of confronta-
tion, we stated in *State v. Anderson and Hochstein*,
207 Neb. 51, 72, 296 N.W.2d 440, 453 (1980), *cert.
denied* 450 U.S. 1025, 101 S. Ct. 1731, 68 L. Ed. 2d 219
(1981): "We are unable to find any requirement in
the law that a sentencing court may consider only
information adduced at trial when exercising discre-
tion in imposing sentence. Likewise, we find no con-
stitutional requirement to permit one convicted the
right to confront all who might give information to
be used by the sentencing court. Such a require-
ment goes far beyond any constitutional mandate."

Defendant contends that the panel erred in permit-
ting Dr. Harlan L. Papenfuss to testify to the fact
that Victoria Lamm was pregnant at the time that
she was killed. Again, we reiterate that § 29-2521
allows the introduction of any relevant evidence.
We find it unnecessary to discuss this assign-

ment further because the panel specifically found that the defendant did not know that Victoria was pregnant at the time he stabbed her. In addition, the testimony was only offered to prove aggravating circumstance in § 29-2523(1)(d), that "[t]he murder was especially heinous, atrocious, cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence," and the panel found that (1)(d) existed for other reasons.

Defendant asserts that the sentencing panel had a duty to expressly distinguish every case cited by him. The defendant never requested that specific findings be made on each case; he merely requested that the panel consider the cases that he offered in making its decision. Further, § 29-2522(3) does not impose such a duty. The statute merely directs the sentencing court to consider factually similar cases to determine whether the sentence of death is excessive or disproportionate, considering both the crime and the defendant.

Defendant's assignments of error dealing with the constitutional issues, including denial of a trial by jury by virtue of the fact that a sentencing panel not a jury imposed the sentence, and his void for vagueness arguments, have been dealt with previously by this court. We find it unnecessary to review these principles again. *State v. Simants*, 197 Neb. 549, 250 N.W.2d 881 (1977); *State v. Rust*, 197 Neb. 528, 250 N.W.2d 867 (1977); *State v. Stewart*, 197 Neb. 497, 250 N.W.2d 849 (1977); *State v. Otey*, 205 Neb. 90, 287 N.W.2d 36 (1979); *State v. Anderson and Hochstein, supra.*

The defendant argues that the death penalty statute, as construed in *State v. Anderson and Hochstein, supra,* to permit consideration of all aggravating circumstances and not just those set forth by statute, is unconstitutional and permits arbitrariness in the imposition of the death penalty, in violation of the eighth and fourteenth amendments to the U.S. Constitution.

We find it unnecessary to reach this assignment because the sentencing panel did not find that a nonstatutory aggravating circumstance existed in this case. However, we pause to note that the U.S. Supreme Court in *Gregg v. Georgia*, 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.), specifically approved the Georgia statutory scheme which authorized the jury to consider any other appropriate aggravating or mitigating circumstances, in addition to the 10 statutory aggravating circumstances, as long as the jury found at least one statutory aggravating circumstance before recommending a sentence of death. The Court did not require that all sentencing discretion be eliminated, but only that it be "directed and limited." *Gregg* at 189.

The remainder of defendant's assignments of error deal with factual findings of the sentencing panel in regard to aggravating and mitigating circumstances. We proceed to review the findings.

The defendant disagrees with the sentencing panel finding that aggravating circumstance (1)(b) of § 29-2523 existed in regard to the death of Victoria Lamm. The pertinent portion of the statute reads as follows: "The murder was committed in an apparent effort to conceal the commission of a crime, or to conceal the identity of the perpetrator of a crime."

In regard to this aggravating factor the sentencing panel found that "[t]he only conclusion that can logically. be reached is that Victoria L. Lamm was murdered to conceal the identity of the defendant, the perpetrator of the sexual assault or attempted sexual assault upon Janet Mesner, and to, at least for a period of time, conceal the commission of that crime. The evidence establishes this beyond a reasonable doubt." We do not feel that the evidence was insufficient for the panel to make such a finding.

Apparently awakened by the noise in Janet Mes-

ner's adjacent bedroom, Victoria Lamm proceeded to investigate, when she was stabbed to death. This was corroborated by the fact that Victoria did not have the defense cuts on her hands that were present on Janet's hands. Victoria also had blood on the bottom of her feet from walking through the blood that was already present on the floor of Janet's bedroom. The telephone in the bedroom was made forcibly inoperative in an attempt to isolate Janet. Victoria did not know the defendant and posed no threat to him except as a witness to the crime he was in the process of committing.

Defendant contends that he could not have been attempting to conceal the crimes, because he left his billfold and several articles of his clothing at the scene of the crime. Defendant would have this court believe that these articles were intentionally left behind to cue in the police as to the perpetrator. After being taken into police custody, however, defendant, when questioned as to the location of his billfold and underwear, did not know of their whereabouts. We are of the opinion that defendant's billfold was dropped inadvertently. The other articles of clothing that were found at the scene of the crime are more indicative of an intoxicated state than a lack of concern of being apprehended.

Section 29-2523(1)(d) reads: ''The murder was especially heinous, atrocious, cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence.'' This aggravating circumstance has been interpreted by this court in *State v. Rust*, 197 Neb. 528, 250 N.W.2d 867 (1977), *State v. Peery*, 199 Neb. 656, 261 N.W.2d 95 (1977), and *State v. Moore*, 210 Neb. 457, 316 N.W.2d 33 (1982), to include murders involving torture, sadism, sexual abuse, or the imposition of extreme suffering. Our reason for so doing was a recognition that while all murders are capable of being characterized by the use of one or more of the adjectives employed in (1)(d), the Legislature has required a much greater

degree of these characteristics than is usually present in a murder by use of the words "especially" and "exceptional." *State v. Rust, supra.* This interpretation is consistent with *Proffitt v. Florida*, 428 U.S. 242, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976), where the U.S. Supreme Court approved a narrowed construction for a similar guideline.

In this case a violent struggle occurred in Janet's bedroom which culminated in her being stabbed seven times. The defense cuts on Janet's hands showed that she tried to defend herself from the defendant's brutal attack. During the time Janet was being stabbed, the defendant attempted to or did subject her to sexual penetration, as shown by the blood on the bed and the defendant's body, including his penis and his clothes. The elevated level of acid phosphate in Janet's vaginal tract was consistent with sexual intercourse having occurred. When defendant left the scene of the crime, Janet Mesner was still alive, but mortally wounded. She did not die quickly, but survived in her wounded condition for a substantial period of time. After she was stabbed Janet had to go downstairs to use the kitchen telephone in order to call for help because defendant had ripped out the upstairs telephone. Janet also made repeated statements that she was in a great deal of pain.

Janet Mesner's murder clearly involved a horrible sexual abuse and the imposition of extreme suffering.

The panel was correct in its findings that § 29-2523(1)(d) was applicable to the first felony murder count.

In regard to the second victim, Victoria Lamm, there were no defense cuts on her body nor any indication that she was able to resist the defendant's attack. Victoria's death appears to have occurred swiftly and suddenly when she walked in on the defendant's assault on Janet. There was also no evidence of any type of sexual assault upon Victoria.

Thus, we find that the sentencing panel was incorrect in finding that aggravating circumstance § 29-2523(1)(d) was present in the second felony murder count.

Section 29-2523(1)(e) reads: "At the time the murder was committed, the offender also committed another murder." We agree with the sentencing panel that the evidence establishes beyond a reasonable doubt that the defendant killed Janet Mesner and Victoria Lamm at about the same time.

As to the mitigating circumstances, § 29-2523(2)(a) reads: "The offender has no significant history of prior criminal activity." The defendant's criminal record is indeed substantial and significant. The defendant had been charged with several drug possessions, 23 bad-check incidents, theft, intoxication, assault, disturbing the peace, false accommodations, and failure to comply with a court order. Nearly all of the charges against the defendant resulted in convictions. We agree with the sentencing panel that "defendant's prior criminal activity is significant so as not to give him the benefit of this mitigating circumstance."

Section 29-2523(2)(b) reads: "The offender acted under unusual pressures or influences or under the domination of another person." "This mitigating circumstance refers only to external pressures, not those a defendant chooses to create for himself." *State v. Peery*, *supra* at 676, 261 N.W.2d at 105. We agree with the sentencing panel that "[t]here were no unusual pressures or influences nor was the defendant under the domination of another person when he killed both Janet L. Mesner and Victoria L. Lamm." This mitigating circumstance does not exist in either count I or count II.

Section 29-2523(2)(c) reads: "The crime was committed while the offender was under the influence of extreme mental or emotional disturbance." Only a small portion of medical testimony at trial suggested that the defendant had a mental or emo-

tional disturbance that was separate and apart from his drug and alcohol consumption on the night of the killings. We agree that "the defendant was not under the influence of extreme mental or emotional disturbance to a degree required by this statutory standard." This mitigating circumstance does not exist with either count.

Section 29-2523(2)(d) reads: "The age of the defendant at the time of the crime." The defendant was 24 years old at the time of the crime. This mitigating circumstance does not exist.

Section 29-2523(2)(e) reads: "The offender was an accomplice in the crime committed by another person and his participation was relatively minor." The defendant acted alone in both killings, and we agree with the sentencing panel that this mitigating circumstance does not exist.

Section 29-2523(2)(f) reads: "The victim was a participant in the defendant's conduct or consented to the act." The sentencing panel found that this circumstance does not exist, and we agree.

Section 29-2523(2)(g) reads: "At the time of the crime, the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental illness, mental defect, or intoxication." We disagree with the sentencing panel's finding that this circumstance does not exist. Our reasons for finding this circumstance applicable are set out in some detail in the statement of facts. In addition, even the prosecuting attorney who tried the case in the trial court and in proceedings before the sentencing panel conceded on at least two occasions that (2)(g) existed. We therefore find as a matter of law that mitigating circumstance § 29-2523(2)(g) existed.

In sum, as to count I, we find beyond a reasonable doubt two aggravating circumstances, § 29-2523(1)(d) and (e), are present. In count II we also find that two aggravating circumstances exist, § 29-2523(1)(b)

and (e). We further find that mitigating circumstance § 29-2523(2)(g) applies to both counts.

Under the provisions of 1978 Neb. Laws, L.B. 711, codified as part of chapter 29, article 25 (Reissue 1978), this court must conduct its own review to determine whether the sentence of death in this case is excessive or disproportionate to the penalty imposed in cases with the same or similar circumstances. We now construe § 29-2521.03 to require an extensive review and analysis of all first degree murder convictions for offenses committed on or after April 20, 1973, including cases presently pending in this court on appeal. The 58 cases reviewed are set out in the addendum to this opinion.

*State v. Williams*, 205 Neb. 56, 287 N.W.2d 18 (1979), is the most similar to the instant case in that they both involved the murder of two women and the sexual assault or the attempted sexual assault of one of them. More aggravating circumstances were found in *Williams*, but this alone does not eliminate the propriety of a death sentence in the instant case. As noted in *State v. Stewart*, 197 Neb. 497, 250 N.W.2d 849 (1977), our analysis is not confined to a mere counting process of aggravating and mitigating circumstances but, rather, to a reasoned judgment as to what factual situations require the imposition of death and which of those can be satisfied by life imprisonment in light of the totality of the circumstances present.

In conclusion, the cases which bear the most similarity to the acts committed by the defendant involved a death penalty. There are sufficient factual differences between the present case and those cases in which a life sentence was imposed, and therefore we find that the death sentence of Randolph K. Reeves is not disproportionate to the sentences in previous first degree murder cases, considering both the crime and the defendant.

We have reviewed the remainder of defendant's

assigned errors, find that they are without merit, and therefore they will not be discussed.

AFFIRMED.

McCOWN, J., not participating.

HASTINGS and CAPORALE, JJ., concur in the result.

ADDENDUM

FIRST DEGREE MURDER CASES ANALYZED
AND REVIEWED AS OF NOVEMBER 15, 1983

CASES APPEALED AND REPORTED

State v. Casper, 192 Neb. 120, 219 N.W.2d 226.
State v. Wilson, 192 Neb. 435, 222 N.W.2d 128.
State v. Nokes, 192 Neb. 844, 224 N.W.2d 776.
State v. Russell, 194 Neb. 64, 230 N.W.2d 196.
State v. Harris, 194 Neb. 74, 230 N.W.2d 203.
State v. Lytle, 194 Neb. 353, 231 N.W.2d 681.
State v. McDonald, 195 Neb. 625, 240 N.W.2d 8.
State v. Ell, 196 Neb. 800, 246 N.W.2d 594.
State v. Sims, 197 Neb. 1, 246 N.W.2d 645.
State v. Stewart, 197 Neb. 497, 250 N.W.2d 849.
*State v. Rust, 197 Neb. 528, 250 N.W.2d 867.
*State v. Holtan, 197 Neb. 544, 250 N.W.2d 876.
State v. Simants, 197 Neb. 549, 250 N.W.2d 881
(conviction reversed).
State v. Record, 198 Neb. 530, 253 N.W.2d 847.
*State v. Peery, 199 Neb. 656, 261 N.W.2d 95.
State v. Beans, 199 Neb. 807, 261 N.W.2d 749.
State v. Scott, 200 Neb. 265, 263 N.W.2d 659.
State v. Simpson, 200 Neb. 823, 265 N.W.2d 681.
State v. Prim, 201 Neb. 279, 267 N.W.2d 193.
State v. Beers, 201 Neb. 714, 271 N.W.2d 842.
State v. Fuller, 203 Neb. 233, 278 N.W.2d 756
(conviction reversed).
State v. Nielsen, 203 Neb. 847, 280 N.W.2d 904.
State v. Bennett, 204 Neb. 28, 281 N.W.2d 216.
*State v. Williams, 205 Neb. 56, 287 N.W.2d 18.
*State v. Otey, 205 Neb. 90, 287 N.W.2d 36.
*State v. Anderson and Hochstein, 207 Neb. 51, 296
N.W.2d 440.
*State v. Harper, 208 Neb. 568, 304 N.W.2d 663.
State v. Ditter, 209 Neb. 452, 308 N.W.2d 350.

*State v. Moore, 210 Neb. 457, 316 N.W.2d 33.
State v. Bradley, 210 Neb. 882, 317 N.W.2d 99.
State v. Boyer, 211 Neb. 139, 318 N.W.2d 60.
State v. Pope, 211 Neb. 425, 318 N.W.2d 883.
State v. Hubbard, 211 Neb. 531, 319 N.W.2d 116.
State v. Jones, 213 Neb. 1, 328 N.W.2d 166.
State v. Lamb, 213 Neb. 498, 330 N.W.2d 462.
State v. Searles, 214 Neb. 849, 336 N.W.2d 571.
State v. Palmer, 215 Neb. 273, 388 N.W.2d 281
(conviction reversed).
State v. Lynch, 215 Neb. 528, 340 N.W.2d 128.
State v. Tucker, 215 Neb. 636, 340 N.W.2d 376.

## CASES NOT APPEALED TO SUPREME COURT

State v. Jimmie Ray Anderson
Sentence 7/26/73
Dawson County - District Court
Case No. 14391

State v. Kelvin Anderson
Sentence 9/25/78
Douglas County - District Court
Doc. 102, p. 85

State v. Blackbonette
Sentence 8/23/82
Lancaster County - District Court
Doc. 59, p. 108

State v. Brown
Sentence 3/25/74
Douglas County - District Court
Doc. 88, p. 625

State v. Bussard
Sentence 2/22/80
Red Willow County - District Court
Case No. 11,542

State v. Floyd
Sentence 5/16/78
Hamilton County - District Court
Doc. 24, p. 196

State v. Hatcher
Sentence 4/14/78
Douglas County - District Court
Doc. 101, p. 321

State v. Marshall
Sentence 3/13/78
Lancaster County - District Court
Doc. 48, p. 262

State v. McGee
Sentence 4/14/80
Sarpy County - District Court
Doc. 38, p. 170

State v. Nollen
Sentence 1/24/83
Washington County - District Court
Case No. 8982, Doc. BB, p. 82

State v. Rehbein
Sentence 6/13/83
Douglas County - District Court
Doc. 113, p. 475

State v. Rowert
Sentence 12/8/77
Platte County - District Court
Case No. 2805

State v. Schaeffer
Sentence 9/30/77
Hall County - District Court
Doc. 28, p. 279

State v. Dwayne Tucker
Sentence 7/28/82
Douglas County - District Court
Doc. 111, p. 465

## CASES PENDING ON APPEAL IN SUPREME COURT NOVEMBER 15, 1983

No. 83-118 - State v. Lee
Sentence 1/24/83
Douglas County - District Court
Doc. 113, p. 308

No. 83-342 - State v. Krimmel
Sentence 4/21/83
Douglas County - District Court
Doc. 114, p. 26

No. 83-497 – State v. Elijah Jones     Douglas County – District Court
    Sentence 6/13/83                              Doc. 114, p. 158
No. 83-576 – State v. Massey         Douglas County – District Court
    Sentence 7/8/83                                Doc. 114, p. 368
*Death Sentence Pending

KRIVOSHA, C.J., concurring in part, and in part dissenting.

I find that I must concur in part and in part dissent from the majority opinion. I am in complete accord with the majority in nearly all of its conclusions, including its declaration that the court's review and analysis in death penalty cases must include all first degree murder convictions for offenses committed on or after April 20, 1973, including cases presently pending in this court on appeal. Having reached that conclusion, however, I believe that for reasons more particularly set out by me in my dissents in *State v. Williams*, 205 Neb. 56, 287 N.W.2d 18 (1979), *State v. Rust*, 208 Neb. 320, 303 N.W.2d 490 (1981), and *State v. Harper*, 208 Neb. 568, 304 N.W.2d 663 (1981), the imposition of the death penalty in this case violates both the state and federal Constitutions as presently interpreted by the U.S. Supreme Court, as well as the provisions of Neb. Rev. Stat. §§ 29-2519 et seq. (Reissue 1979).

As I have previously indicated, my conclusion here is not based upon any notion that the crime involved herein was not heinous, as that term is normally understood, or that the appellant in this case should not receive the most severe sentence which the law may impose. Rather, it is because I believe the provisions of both the state and federal Constitutions, adopted by the people, and the provisions of §§ 29-2519 et seq., adopted by the people through their representatives, the Legislature, have ordered otherwise. In my view one cannot review all of the cases in which a life was intentionally and unlawfully taken and conclude that the imposition of the death penalty in this case is uniform and proportional to other cases. The legislative intent as expressed in § 29-2521.01 makes clear that the death

penalty is not to be imposed in an arbitrary fashion. See, also, *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972). Absent the Legislature modifying or repealing §§ 25-2519 et seq., we are bound by their provisions. It is not for the courts to override the dictates of the people in that regard. It is for that reason that I would concur in all of the majority's opinion except that portion which affirms the imposition of the death penalty. Instead, I would impose a sentence of life and would hope that, by imposing a sentence of life, the board of pardons would not commute that sentence, so that the appellant in this case, having taken a life as an animal, would be required to spend the rest of his days living as an animal, within a cage. In my view that would indeed be a far greater punishment for the crime committed than even the one imposed by the majority.

BOSLAUGH, J., concurring.

I concur in the opinion and judgment of the court except as to the analysis and review of death penalty cases required by Neb. Rev. Stat. § 29-2521.03 (Reissue 1979).

I adhere to the construction of the statute adopted by the court in *State v. Williams*, 205 Neb. 56, 287 N.W.2d 18 (1979).