STATE OF NEBRASKA, APPELLEE, V. WESLEY MASSEY, APPELLANT.
357 N.W.2d 181

Filed October 26, 1984.   Nos. 83-576, 83-577.

Thomas M. Kenney, Douglas County Public Defender, and Stanley A. Krieger, for appellant.

Paul L. Douglas, Attorney General, and Sharon M. Lindgren, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, and SHANAHAN, JJ.

WHITE, J.

The defendant, Wesley Massey, appeals from convictions on charges of felony murder, Neb. Rev. Stat. § 28-303(2) (Reissue 1979), and kidnaping, Neb. Rev. Stat. § 28-313 (Reissue 1979). The defendant's conviction for first degree murder was based upon a jury verdict finding him guilty of killing another person in the perpetration of a robbery. Massey was sentenced to life imprisonment on the felony murder conviction, such sentence to be served consecutively with any and all sentences currently being served in the State of Colorado. Massey was also convicted and sentenced to 50 years' imprisonment on the charge of kidnaping, such sentence to be served consecutively with any and all sentences being served in Colorado, but to be served concurrently with the sentence for first degree felony murder.

The defendant assigns the following errors: (1) The trial court improperly admitted into evidence exhibit 36B, the .38-caliber revolver allegedly used in the killing, and (2) The trial court erred in failing to instruct the jury that it could find the defendant guilty of second degree murder or manslaughter. We believe the appellant's claims of error are without merit, and the judgment and sentences imposed are affirmed in all respects.

The record reveals that the gun, which was admitted into evidence over defense counsel's objection, came into the possession of Omaha police officers in the following manner.

On the evening of May 23, 1977, Omaha police officers responded to a reported shooting at the Ramada Inn hotel, located at 7007 Grover Street in Omaha, Nebraska. Officer G. W. Goodrich, responding to a description of a vehicle believed to be involved in the shooting, observed a similar vehicle a few blocks from the scene of the shooting and stopped it near the vicinity of 50th and L Streets. A female occupant of the vehicle was arrested and later identified as Mary Catherine Larson, a companion of the defendant. Upon her arrest the contents of Larson's purse were searched. Among other miscellaneous items, the purse contained a photograph of a white male, rubber surgical gloves, keys to a couple of motel rooms, and .38-caliber bullets. Officers later identified the male in the

photograph as the defendant.

Later that evening while in custody, after learning of the death of the victim, Gary Damron, and after being fully advised of her *Miranda* rights and subsequently waiving those rights, Larson gave the Omaha police a statement implicating herself and the defendant, Wesley Massey, in the murder. Larson also informed the police of an address in Colorado Springs where she and the defendant had previously lived. As a result of this information and an initial investigation made at the scene of the murder, a "wanted" bulletin was issued for the arrest of Massey.

During the course of the next 2 days, the information gathered about Massey was communicated to Larson's parole officer in Colorado and passed along by him to the Colorado Springs Police Department. At the suppression hearing prior to trial, Officer Bruce Baxter of the Colorado Springs Police Department testified that someone in his office had spoken with the parole officer around 10 a.m. on May 26, 1977. Approximately 4 hours after receiving this information, three Colorado Springs officers went to the address provided by Larson. At the time the officers went to this address, they had additional information that Massey was a suspected escapee from the Colorado State Penitentiary. The officers had not, however, secured a warrant for Massey's arrest.

When the officers arrived at the address, they discovered a 1972 Plymouth vehicle bearing Nebraska license plates parked behind the apartment. A check on the car revealed that it was a stolen vehicle, the owner of which had been kidnaped in Omaha, released somewhere near Brighton, Colorado, and the defendant was a suspect in the kidnaping.

The police then knocked on the door of the address provided by Larson. They noticed a person inside, but no one answered the door. The officers then went to an upper apartment in the building and showed the occupant a photograph of the defendant. The occupant told the police that someone similar to the person in the photograph was living in the lower apartment. Upon their return to the lower apartment, one of the officers found an unlocked window to the apartment. The officer lifted up the window, entered the apartment, and unlocked the door for the other two officers. While inside the

apartment, the officers heard a noise coming from one of the bedrooms, and they ordered the occupants to come out. Massey came out of the bedroom and was arrested without incident. Officers then secured the apartment and brought Massey to the police station. After being advised of his *Miranda* rights, Massey agreed to discuss the kidnaping, but refused to discuss the homicide that had occurred in Omaha.

Later in the afternoon of May 26, Colorado police officers obtained a search warrant for the apartment where Massey had been arrested. The affidavit accompanying the application for the warrant contained, along with other information, a statement that the defendant had been arrested on the premises. The warrant was issued and executed around 6 p.m. that same evening. Pursuant to the search warrant, the officers found a .38-caliber revolver in a small box inside one of the bedroom closets. At the suppression hearing Officer Baxter conceded that at the time Massey was arrested none of the officers had seen the gun.

Prior to trial, the defendant moved to suppress any evidence found as a result of the search, contending that any evidence seized as a result of his illegal arrest in his home should be suppressed as "fruit of the poisonous tree," under *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). The defendant's motion to suppress was denied. At trial the .38-caliber revolver was admitted into evidence. Appellant's chief contention before this court is that such "critical evidence" should have been suppressed and that its admission into evidence is reversible error.

Although this court has previously condemned warrantless arrests in the home, we need not decide whether the gun was indeed "tainted," because, under the circumstances of this case, the admission of the gun into evidence was harmless error beyond a reasonable doubt. *Payton v. New York*, 445 U.S. 573, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980); *State v. George*, 210 Neb. 786, 317 N.W.2d 76 (1982). In a criminal case this court will not set aside a judgment on the grounds of the improper admission of evidence if, after an examination of the entire case, we consider that no substantial miscarriage of justice has actually occurred. *State v. Smith, ante* p. 201, 352 N.W.2d 620

(1984).

The jury's verdict in this case is amply supported by overwhelming evidence which is not tainted by the warrantless arrest nor the search warrant obtained as a result thereof. Larson, the defendant's accomplice, testified that on the evening of the murder she and Massey had registered at the Ramada Inn at 7007 Grover Street. As both were short of cash, Larson and Massey devised a plan whereby Larson would make contact with a customer of the hotel and lure the victim to one of the hotel rooms where Massey would rob the victim. On the evening of May 23, 1977, the victim, Damron, was a guest of the hotel. Damron was in the hotel lounge that evening, and according to Larson's testimony, she approached the victim and the two shared a few drinks. Larson also testified that when Damron left the lounge for a brief period of time during the evening, she met Massey in the hall outside the lounge "[t]o let him know that [she] had found someone." Larson and Damron later left the lounge and went to room 219 of the hotel, the room that she and Massey had checked into earlier that evening. Larson testified that once she and Damron were in the room, Massey hit Damron over the head with a liquor bottle. The blow stunned Damron and he started bleeding. Massey then pulled a gun, the .38-caliber revolver obtained during the search, on Damron and demanded his money. Damron refused, and Massey hit him over the head with the gun. This blow knocked Damron unconscious. Massey then took a $5 bill out of Damron's pocket and a bracelet off his wrist.

When Damron regained consciousness, Massey ordered him to take off his clothes. Damron took off his suit jacket, vest, and shoes. These items of clothing were recovered from the scene by the police, identified by Larson in court, and admitted into evidence. Larson further testified that after Damron had removed part of his clothing, a fight broke out between Massey and the victim. According to Larson, the fight was precipitated by Damron's insistence that he did not have any more money. The struggle between Massey and Damron continued out into the hallway of the hotel. Larson remained in the room and lost sight of both men. She testified that Massey returned to the room a minute or two later and told Larson to "get the stuff

together." Larson testified that Massey remained in the room for a couple of minutes, during which time he expressed concern about the amount of blood on his clothing. Massey then left the room. Shortly thereafter, as Larson left the hotel room and was walking down the hallway, she saw Massey and Damron struggling again in front of the elevator. She did not see Damron strike Massey at any time, but she did see the two get on the elevator.

Mr. Keith Bjerk, a business acquaintance of Damron's, also testified for the State. Bjerk testified that he had been with Damron earlier on the evening of the shooting. He had asked Damron to join him for dinner, but Damron had declined. After returning from dinner that evening, Bjerk walked through the lobby of the hotel, saw the elevator doors open, and noticed two men pushing each other. He then saw Damron stumble out of the elevator, "looking like somebody had poured a can of red paint on his head." Damron then shouted at Bjerk, "Help me, Keith. This guy's trying to kill me." Bjerk testified that Damron tried to get away from the defendant but was unsuccessful in his attempt. Bjerk stated that he then walked over and put his hand on Massey's shoulder and said to him, "Come on, man, this guy's had enough." Bjerk testified that at that time the defendant hit Damron's head with the gun and then stuck the gun to Damron's side and shot him. Bjerk saw the gun go off and recalled the flash. Bjerk testified that he then ran into the hotel lounge to warn people that there was a man in the lobby with a gun. As Bjerk ran back out into the lobby, he saw the defendant leave the hotel. At trial Bjerk identified the defendant as the man who shot Damron.

The pathologist who conducted the autopsy on Damron also testified at the defendant's trial. With the assistance of photographs of the victim to illustrate his testimony, the pathologist identified the various injuries to Damron. It was the pathologist's conclusion that the primary cause of the victim's death was a gunshot wound to his chest. In his opinion, the type of wound suffered by the victim was produced by a gun placed directly against the body before firing.

Further physical evidence linking the defendant to the crime was introduced at trial, specifically a white baseball cap. Both

the hotel bartender on duty the evening of the murder and Larson identified a white hat recovered by the police from room 219 as the hat worn by the defendant that evening.

In determining whether to uphold a conviction, this court will sustain the jury's verdict if, viewing the evidence in a light most favorable to the State, there is sufficient evidence to support it. *State v. Weible*, 211 Neb. 174, 317 N.W.2d 920 (1982). In light of the foregoing summary of testimony from the defendant's accomplice, an eyewitness to the murder, and the examining pathologist, plus the additional physical evidence recovered from the scene and admitted into evidence, there is clearly sufficient evidence to support the jury's verdict. The admission of the .38-caliber revolver into evidence in this case did not unduly prejudice the defendant.

The defendant's second assignment of error is also without merit. In *State v. Reeves*, 216 Neb. 206, 217, 344 N.W.2d 433, 442 (1984), this court clearly stated that

"[w]here an information charges a defendant with a killing committed in the perpetration of or an attempt to perpetrate one of the specific felonies set out in § 28-303(2), second degree murder and manslaughter are not lesser-included offenses, and it is ordinarily error for the trial court to instruct the jury that it may find the defendant guilty of second degree murder or manslaughter, even though such an instruction is requested."

As Massey was charged with felony murder, the trial court properly refused to grant the requested instructions. The convictions and sentences imposed are affirmed.

AFFIRMED.