STATE OF NEBRASKA, APPELLEE, V. SCOTT MARTIN KEESECKER, APPELLANT.

253 N. W. 2d 169

Filed May 4, 1977. No. 40841.

Frank B. Morrison and Bennett G. Hornstein, for appellant.

Paul L. Douglas, Attorney General, and Harold Mosher, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, BRODKEY, and WHITE, JJ., and KUNS, Retired District Judge.

WHITE, C.J.

This is an appeal by the defendant from his conviction for the second degree murder of Ronald H. Wilson in Omaha, Nebraska, on November 5, 1975. The defendant was found guilty by a jury and sentenced by the District Court to a term of 25 years imprisonment in the Nebraska Penal and Correctional Complex. We affirm the judgment and sentence of the District Court.

On appeal the defendant raises two contentions. First, that the District Court erred in admitting into evidence various exhibits which were tape recordings and written transcripts of his confession to the police. Second, that the District Court committed reversible error in overruling his motions for a directed verdict in that the evidence at trial was insufficient as a matter of law to sustain his conviction. We shall deal with each of these contentions in order.

The defendant argues that the tape recordings and written transcripts of his confession to the police should have been excluded because they were obtained in violation of his constitutional rights.

In Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the Supreme Court held: '' * * * we hold that an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation * * *. * * *

"If the individual states that he wants an attorney the interrogation must cease until an attorney is present. At any time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent."

The defendant was first interviewed by police on November 5, 1975, the date of the shooting. At this time, the police performed a gunshot residue test upon the defendant. On December 22, 1975, the results of the gunshot residue test on the defendant were received by the Omaha police department. The test results indicated that the defendant had fired the gun which killed Wilson.

On the basis of these test results, officers Brisby and Bruner of the Omaha police department decided to reinterview the defendant. They drove to the defendant's residence and told him that more evidence had been uncovered in the case. They asked the defendant if he would come with them to the central station to talk with them. The defendant testified that he was not placed under arrest on December 22, 1975, but voluntarily went with officers Brisby and Bruner to police headquarters. The officers had arrived at the defendant's residence at about 7 p.m. Nothing was said during the drive to

the police station. They arrived at approximately 7:30 p.m. at the police station.

The defendant was taken to an interview room in the detention area. According to officer Brisby, the defendant appeared normal at the time. The defendant was first advised of his constitutional rights. He answered "yes" to all the questions contained on the rights advisory form used by the officers and appeared to understand all the questions. Thereafter, in response to questioning by the officers, the defendant acknowledged that he had been responsible for shooting Wilson.

Officer Brisby then told the defendant that they wanted a taped statement, which the defendant agreed to give. Prior to this time, the defendant had not requested the presence of an attorney. As one of the officers started to put the tape onto the recorder, the defendant told the officers that he thought he should talk to an attorney. He then asked the officers to get an attorney for him. Officer Brisby testified he told the defendant that police officers do not contact attorneys, but that the defendant was free to do so if he desired. There was a telephone in the interview room, and the defendant was told that he could use it to call one if he desired. Officer Brisby stated that the defendant would have been allowed to call an attorney if he had wanted to.

The defendant then stated that he would go ahead and make the taped statement. He was again read his rights and made the taped statement. During the evening the taped statement was transcribed by police personnel. In the morning of December 23, 1975, officer Clark was assigned to take the transcript to the defendant for him to make corrections and sign. Officer Clark again read the defendant his rights. The defendant made several changes on the transcript and signed the statement. This was at approximately 4 a.m.

The defendant recalled being fully advised of his

Miranda rights. He testified that he repeatedly asked to be furnished an attorney but was told that it was too late to get one. He stated that he made the statement because he concluded that he had no alternative. Officer Bruner testified that the police interrogation never advised the defendant that it was impossible to get him a lawyer because of the lateness of the hour, but they did tell him that they could not get a lawyer for him.

In Miranda, *supra,* the Supreme Court held that an accused could voluntarily waive his constitutional right to have an attorney present during questioning. The court stated: "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. * * *

"An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. * * *

"After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement."

In State v. Ransom, 182 Neb. 243, 153 N. W. 2d 916 (1967), we held: "The rule is that where the evidence as to what occurred immediately prior to and at the time of the making of a confession shows that it was freely and voluntarily made and excludes the hypothesis of improper inducements or threats, the confession is voluntary and may be received in evidence." See, also, State v. Perez, 182 Neb. 680, 157 N. W. 2d 162 (1968); State v. Deardurff, 186 Neb. 92, 180 N. W. 2d 890 (1970).

The District Court concluded that the defendant was advised of his constitutional rights; that the

statement he made was voluntary; and that there was an intelligent and knowing waiver of rights. The record shows that the defendant was advised of his rights at the onset and throughout the interrogation. This included his right to obtain an attorney and have him present during questioning. He was offered both the means and the opportunity to contact an attorney. Rather than contacting an attorney, or else cutting off the interrogation, the defendant decided to go ahead and make the taped statement. There is no evidence in the record of any form of police coercion upon the defendant. There was no violation of the defendant's constitutional rights under these circumstances, and the District Court correctly admitted into evidence the defendant's confession. There is no merit to this contention.

The defendant next contends that there was insufficient evidence to support his conviction. Generally, a voluntary confession is insufficient, standing alone, to prove that a crime has been committed, but it is competent evidence of that fact and may, with slight corroborative circumstances, be sufficient to sustain a conviction. State v. Moss, 182 Neb. 502, 155 N. W. 2d 435 (1968).

In addition to the defendant's confession, there was the following evidence. Carly Allen testified that he owned the house in which the defendant and Wilson shared an apartment. On the evening of November 5, 1975, Allen and several others got together at Allen's residence, about a half block from the house where the defendant and the victim, Wilson, lived. Both the defendant and Wilson were at Allen's house that evening. The defendant left twice during the evening for about 5 minutes each time. He appeared nervous and his hands were shaking. Around 8 p.m. Wilson left the Allen residence and returned to the apartment. Around 5 to 10 minutes later, the defendant left. The defendant was alone

with Wilson at the time of the shooting. The defendant returned about 10 minutes later and told those at the Allen house that Wilson had shot himself in the head. Beverly Allen, Allen's ex-wife, testified that the defendant and Wilson had argued on previous occasions.

A gunshot residue test was given the defendant. Richard Meyers, a forensic chemist, analyzed the test given to the defendant. He testified that the test results were consistent with the conclusion that the defendant had fired the weapon and not merely picked it up.

Dr. Jerry Jones, a pathologist, conducted an autopsy on the victim's body. An external examination of the victim's body revealed a rounded shotgun wound on the left side of the victim's head. He testified that this was not the typical contact wound found in suicides. He estimated that the wound was inflicted from about 10 feet.

Officer Williams of the Omaha police Department was the first officer to enter the victim's apartment. He found the victim slumped in a chair with blood coming from his wound. He testified that he observed the shotgun leaning against a table to the right of the chair. Marcellus Deats, an Omaha police criminalistics technician, handled the crime scene investigation. He also observed the shotgun leaning against a small table to the right of the chair in which the victim was slumped. Although the victim was covered with quite a lot of blood, the shotgun was quite clean.

This evidence, in addition to the defendant's confession, was sufficient to sustain his conviction.

The judgment and sentence of the District Court are correct and are affirmed.

AFFIRMED.