State of Nebraska, appellee, v. Reginald C. Bennett, appellant.

281 N. W. 2d 216

Filed July 10, 1979. No. 42256.

Thomas M. Kenney, Douglas County Public Defender, and Bennett G. Hornstein, for appellant.

Paul L. Douglas, Attorney General, and Linda A. Akers, for appellee.

Heard before KRIVOSHA, C. J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

WHITE, J.

The defendant was charged in the District Court for Douglas County with first degree murder in the commission of a robbery of James G. Sloan on February 25, 1978. The jury found the defendant guilty and he was sentenced to a term of life imprisonment in the Nebraska Penal and Correctional Complex. Defendant appeals. We affirm.

We will discuss defendant-appellant's two assignments of error in the order presented. The first is that the District Court committed reversible error in denying the defense motions for a directed verdict made at the conclusion of the State's case, and again at the conclusion of the defense evidence, because the evidence was insufficient as a matter of law to prove corpus delicti and defendant's guilt beyond a reasonable doubt.

At approximately 7:30 p.m., on February 25, 1978, the Omaha city rescue squad was summoned to 701 South 22nd Street, Omaha, Nebraska, near the Drake Court Apartments, where a man, later identified as the defendant, ran up to the squad and informed them that an injured party was at the east end of the complex. There the victim was found lying face down on the sidewalk. He had obvious head

injuries and a considerable amount of blood was present under his head on a concrete sidewalk. The victim was not breathing and had no pulse. He was transported to the Lutheran Medical Center where, after failing to respond to treatment, he was pronounced dead.

An autopsy was performed by Dr. Richard B. Wilson, a pathologist. Dr. Wilson testified that, when he examined the victim, he found a deep cut on the forehead, obviously not made by a knife, as the edges were bruised and a little torn. There were other wounds on the side and near the top of the head. Upon removal of the brain by Dr. Wilson, the victim was found to have suffered a fractured skull and consequent release of blood into the ear canal. Examination of the body other than the head revealed by Dr. Wilson a greatly enlarged heart: "Looking at the heart valves, I found that the outlet valve, the one from the left chamber of the heart that carries blood down through the body cavity, was almost completely blocked. I could not get a finger through it. Normally one could put a thumb through this valve. It's very large. And so it was very firm also. And the term we use for this is calcification, * * *." The victim was also found to have seventeen-hundredths of one percent of alcohol in the blood as shown by the toxicology report.

Dr. Wilson testified that the "Proximate, * * * cause * * * [of death] is multiple head injuries, one of which may have been due to a direct blow * * * while the others appear to most likely result from a fall." Dr. Wilson explained that by the term proximate cause he meant "without the head injuries, * * * the man would still be walking around, * * *." There was sufficient evidence to prove that, while the victim's preexisting heart condition and consumption of alcohol may have contributed, the direct cause of death was the blows to the head.

A brick or cobblestone found near the victim's

body was sent to the State Crime Laboratory in Lincoln. Examination of the stone by Karen Schmidt, a forensic serologist, revealed a small amount of blood. The size of the sample precluded further tests to determine whether it was of human origin.

The defendant was identified at trial as the person at the scene when the rescue squad arrived. He directed the crew to the victim and attempted to assist them in placing the victim in the ambulance. About 1½ hours after the victim's body was taken to Lutheran Hospital, the defendant, identifying himself as David Brown, telephoned the hospital and inquired about Mr. Sloan's condition. Soon thereafter, the defendant appeared at Lutheran Hospital, again identified himself as David Brown, and again inquired about the condition of the victim. He later explained the use of this alias by saying that he felt there might be a warrant for his arrest due to a traffic ticket which had recently become past due.

He was directed by hospital personnel to Omaha police officers who, after contacting a Sergeant Olson, arranged to have the defendant taken to Omaha police headquarters for questioning.

It is clear the defendant was not then in custody, voluntarily accompanied the officers, and was considered as a material witness in a possible homicide. Officer Lanny Lenker was ordered from off-duty status to headquarters to question the defendant. He began questioning the defendant after 9:30 p.m., on February 25 at the police station. He asked the defendant to accompany him to the death scene which the defendant agreed to do. The defendant had stated he left his vehicle at Lutheran Hospital. Following examination of the death scene, Officer Lenker drove him there but his car was not to be found. The defendant claimed it must have been stolen. Officer Lenker checked with the hospital security guard who recalled having seen the defendant at the hospital but not with any vehicle. Officer Lenker then asked

the defendant to empty his pockets to see his car keys. When he dumped out his pockets, no keys could be found but the officer then observed a rent receipt bearing the name of Reginald Archie. The defendant had also been unable to produce any identification. At this time Officer Lenker concluded the defendant was a prime suspect in the homicide and returned him to the police station just after midnight. They began a series of police interrogations culminating in a tape-recorded confession given to Officer Subby Salerno at about 6 a.m.

The first interview, conducted by Officer Jack O'Donnell, began at midnight, at which time the defendant was orally given the Miranda warnings and agreed to talk to the officer. The interview lasted until 2:20 a.m. During that time, according to Officer O'Donnell's testimony, the defendant first stated that he had wanted to go out with his wife at about 6 in the evening but his wife did not wish to go with him. He had about $3 when he left his house. He got into his automobile and drove to the South Omaha area. He then drove to a Colonial Hills apartment located at South 13th Street, Omaha, where he intended to talk to a man but could not find him. He said he talked to the man's girl friend for awhile, left there, got into his automobile, and about this time a friend of his that he knew by the name of Reginald Spears came up to him and got into his automobile where they talked for awhile. Reginald Spears wished to borrow $10 from the defendant because he had rented an apartment at the Drake Court earlier that day for $20, later decided he did not want the apartment, and needed some money. The defendant had no money so Reginald Spears left and the defendant returned to his residence. He said that he was nearing his home, apparently having parked his car, and was walking when he saw a man lying on the ground. He yelled for somebody as the man needed help. He ran up the street to call the police and then

waited for the rescue squad. He offered to help them put the man in the rescue car and eventually went back to his apartment where he told his wife that he was going out to look for a job. He went down to the corner where he called the hospital to determine the condition of the man, eventually went to the hospital, and was then brought down to the police station.

At about 1 a.m., during the O'Donnell interview, the defendant admitted his name was not David Brown, first claiming his real name was Reginald Spears, then Reginald Bennett. At 1:30 a.m., the defendant signed a written consent for a search of his apartment. Earlier in the interview the defendant had denied he had seen or taken any of the personal property of the deceased; however, after the search of his apartment began, he directed the officers to a set of keys which were later found to open the victim's apartment. The police at the same time found a slip of paper, a form of receipt with the victim's name on it.

On return to the central police station, the defendant recounted the events of the prior evening, this time giving a different version then he had given earlier. He stated that he left his apartment by himself to walk up to 22nd and Jones Streets to get some candy for his wife. When he was walking up the stairs by the Drake Court, he ran into Mr. Sloan who held an object in his hand and threatened to spray him with what he thought was mace. A little later the defendant stated that Mr. Sloan could have possibly thought he was going to rob him and, after defendant was pushed to the ground, he threw a rock at Mr. Sloan or hit him with a rock. Later, in the same interview, he retracted this story, admitted he had made it up, and stated the correct story was the version he told Officer Lenker, namely, of simply finding the body. The interview was concluded and defendant was placed in a cell at approximately 2:20

a.m.   At approximately 3:45 a.m., the defendant was brought from his cell to an interrogation room where he was interviewed by Officer Subby Salerno. That interview concluded at 6 a.m., with a taped statement in which the defendant admitted striking the victim in the head with a large rock.  He said he did this after Mr. Sloan reached into his pocket. After Mr. Sloan fell to the ground, the defendant picked up some change, keys, and a wallet containing $3.  After the interview, the defendant led the officers to a trash can into which he had thrown the victim's wallet and they retrieved it.

At trial, the defendant retracted his confession and again stated that he and his wife found the body after it was already on the ground.   The jury obviously chose not to believe that version of the facts.   The evidence of the defendant's statement, together with the physical facts, are obviously sufficient to sustain both the overruling of the motion for a directed verdict and the conviction of first degree murder.   A motion for directed verdict will be denied unless there is a total failure of competent proof in a criminal case to support a material allegation in the information or where the testimony adduced is of so weak or doubtful character that a conviction based thereon could not be sustained.   State v. Webb, 197 Neb. 662, 250 N. W. 2d 625 (1977).

The judgment will be affirmed unless, as contended by the defendant in his second assignment of error, the confession was given involuntarily or without a knowing waiver of his right to remain silent and right to counsel.

A defendant's confession is admissible in evidence against him only if it was voluntarily given.   The totality of the circumstances must show that the confession was the product of a rational intellect and free will.   See, Blackburn v. Alabama, 361 U. S. 199, 80 S. Ct. 274, 4 L. Ed. 2d 242 (1960); State v. Longmore, 178 Neb. 509, 134 N. W. 2d 66 (1965).   A further

prerequisite to admissibility of any statement given during custodial interrogation is that the defendant was informed, prior to making the statement, of his constitutional privilege against self-incrimination and right to counsel. See Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

There is first the assertion of the defendant that the interrogation by Officer Lenker, after defendant identified himself as David Brown to the Omaha police officers at the Lutheran Hospital, was, in fact, custodial and, since he was not advised of his rights, all further statements given thereafter were tainted. This contention is without merit.

The Miranda procedures apply equally to exculpatory as well as inculpatory statements, but they were not meant to preclude law enforcement personnel from performing their traditional investigatory functions such as general on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the factfinding process. See, United States v. Akin, 435 F. 2d 1011 (5th Cir., 1970); Miranda v. Arizona, *supra.* As related previously, the police officers testified that the defendant was not in custody and was being interviewed as a material witness, a fact with which the District Court hearing the evidence agreed. Defendant was, in fact, returned to the Lutheran Hospital for the purpose of picking up his automobile which he had voluntarily told the officers he had driven to Lutheran Hospital. He then informed the officers that the car was stolen. The officers, after finding the defendant possessed no keys for the vehicle spoken of, and after receiving a statement of the security guard that he saw the defendant but without an automobile, concluded the defendant was probably lying. It was only at this point that the police seriously began to consider the defendant as a prime suspect.

He was arrested and no further statements were taken until Officer O'Donnell informed him of his

rights at the interrogation which began at midnight. Officer O'Donnell did so orally and from memory rather than using the standard rights advisory form. When asked to repeat those rights at trial, he inadvertently omitted the required warning: "Anything you may say can be and will be used against you in court." He had not, however, omitted the warning when asked the same question at the earlier suppression hearing, and the evidence was properly admitted.

"[W]here the evidence as to what occurred immediately prior to and at the time of the making of a confession shows that it was freely and voluntarily made and excludes the hypothesis of improper inducements or threats, the confession is voluntary and may be received in evidence." State v. Keesecker, 198 Neb. 426, 253 N. W. 2d 169 (1977).

Each of the officers who testified at the suppression hearing testified that the defendant was alert, that the statements were voluntary, and that the defendant voluntarily spoke with the officers. Officer Salerno, who obtained the tape-recorded confession, testified that the defendant was alert; the defendant said he felt well; and he was willing to speak with Officer Salerno. The tape itself makes it clear the defendant was fully informed of his rights and there was no duress, coercion, threats, or promises of reward or immunity.

Defendant would have us reverse on his bald assertion unsupported by any corroboration that he felt threatened, was, in fact, tired and weary, and was denied his rights. The defendant had a fair hearing on the subject of the Miranda rights and the evidence fully supports the trial court's judgment. The judgment and sentence are, therefore, affirmed.

AFFIRMED.