IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

STATE V. RUSH

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,
V.
CLIFFORD L. RUSH, APPELLANT.

Filed October 1, 2013.    No. A-13-045.

Appeal from the District Court for Lancaster County: JOHN A. COLBORN, Judge. Affirmed.

Dennis R. Keefe, Lancaster County Public Defender, and John Jorgensen for appellant.

Jon Bruning, Attorney General, and Kimberly A. Klein for appellee.

MOORE, PIRTLE, and BISHOP, Judges.

MOORE, Judge.

INTRODUCTION

Clifford L. Rush appeals from his conviction following a jury trial in the district court for Lancaster County of driving under the influence (DUI), third offense, with refusal to submit to a chemical test and driving during revocation. Rush challenges the denial of his motions to suppress evidence obtained following the stop of the vehicle he was driving and the statements he made following the stop. He also asserts that the district court failed to make sufficient findings of fact in denying his motions to suppress and erred in admitting evidence regarding his failure to submit to a breath test. Finally, Rush argues that there was insufficient evidence to show he was under the influence of alcohol at the time of the stop and that the sentences imposed upon him were excessive. Finding no merit to Rush's assignments of error, we affirm.

- 1 -

BACKGROUND

*Information.*

On April 26, 2012, the State filed an information charging Rush with DUI, third offense, with refusal to submit to a chemical test in violation of Neb. Rev. Stat. §§ 60-6,196 (Reissue 2010) and 60-6,197.03(6) (Cum. Supp. 2012), a Class IIIA felony, and driving during revocation in violation of Neb. Rev. Stat. § 60-4,108(1)(a) (Reissue 2010), a Class II misdemeanor.

*Motion to Suppress.*

Rush filed motions to suppress and a motion requesting a hearing pursuant to *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964). The district court heard Rush's motions on June 25, 2012.

The evidence at the hearing shows that police officers John Kossow and Justin Roach were on patrol in their cruiser on March 10, 2012, when, at about 10:55 p.m., they ran a routine license plate check of a van driving in front of them. Upon running the plate check on their mobile data terminal, the officers learned that the registered owner of the van, Timothy Rush, had a 15-year license suspension. The information on the terminal included both a Department of Motor Vehicles photograph of Timothy and a booking photograph from prior police contacts. Kossow testified that the officers pulled up next to the van on the driver's side. Kossow had had prior contact with Timothy, and upon comparing the photographs displayed on the terminal with the face of the person driving the van, the photographs appeared to be of the same person. Although the lighting was not perfect, Kossow felt it was sufficient that he was able to get a look at the driver, whom he thought was Timothy.

When the stoplight changed, the officers began to follow the van, and Kossow activated the cruiser's overhead lights. Because the van continued without stopping, Kossow started "hitting the siren." The officers continued to follow the van until it pulled into a gas station. It did not appear that the van pulled over in response to the lights and siren, but instead appeared to have pulled up to the gas pumps. The driver got out of the van and did not acknowledge the officers' presence until Kossow spoke to him and directed him to get back in the van. Kossow asked the driver why he did not stop, and as Kossow approached the driver, he detected a very strong odor of alcohol. Kossow realized simultaneously that the driver was not Timothy and that the driver was intoxicated. Kossow formed his belief that the driver was intoxicated based on his observations of slurred speech, watery and bloodshot eyes, and extreme confusion. Upon observing the driver more closely, Kossow realized that the driver was Rush, Timothy's brother, whom Kossow also knew from previous encounters. Kossow had dealt with both of them in the past, and he testified they look enough alike that they could be mistaken for one another. Kossow thought that Rush also did not have a driver's license.

Kossow then asked Rush for his driver's license, and Rush appeared confused and extremely intoxicated. Eventually, Rush gave his name, and when the officers checked his driver's license status, they confirmed that his license was suspended as well. Kossow asked Rush to perform some field sobriety tests, which he did, and Rush showed impairment on all of them. Roach administered a preliminary breath test (PBT), which Rush failed as well. During Kossow's contact with Rush, he observed generally that Rush was very unsteady, had trouble walking, and swayed as he stood. Kossow commented to Rush that it was obvious he had been

drinking, and Rush said he had had "one." Kossow told Rush that he knew he should not be driving because he did not have a license and because he had been drinking, and Rush yelled back that he knew he did not have a license. After the PBT, the officers placed Rush under arrest. Kossow testified that he formed the opinion Rush was under the influence based on Rush's performance on the field sobriety tests, his general appearance, and the PBT, although Kossow formed this opinion even before Rush took the PBT.

Roach also testified about the events on the evening of March 10, 2012. His testimony was substantially similar to Kossow's testimony, except that Roach indicated that the officers initially pulled alongside the passenger side of the van. Roach indicated that the individual he saw driving appeared to be Timothy, as the facial features of the driver very closely matched those in the photographs of Timothy. According to Roach, the van continued moving after the officers activated the cruiser's overhead lights, almost like the driver was ignoring the police. Roach stated that Kossow "tripped" the siren a few times too, but the van just kept going until it stopped at the gas pump, at which point the officers initiated contact. While Kossow approached the driver of the van, Roach contacted the passengers. Roach did not have contact with the driver until Rush was placed in the back seat of the cruiser. Roach thereafter performed the PBT on Rush.

Once Rush was arrested, the officers transported him to jail, took Rush to the testing room, read him the postarrest chemical test advisement, and began the formal testing process. Roach read the advisement to Rush, slid the advisement form over to Rush, asked him if he understood it, and told him he had the right to read it himself. Roach also asked Rush if he had any questions and told him he had to sign by the "X" if he understood what was read to him. Rush became belligerent and out of control, refused to sign the form, and slid it back to Roach. Roach then checked Rush's mouth for foreign objects, began the 15-minute observation period, and gave Rush the opportunity to take the breath test, which Rush refused. At some point, Rush told Roach that he has asthma and pointedly told the officers that he was not going to take the test since he had already taken the PBT. Although Kossow and Roach repeatedly explained to Rush the reason for the two tests and told him this was the formal test, Rush called them several names and said he would not take the test. According to Roach, Rush's statements were not made in response to questions from the officers. Roach testified that at the jail, neither officer attempted to elicit information from Rush other than in response to demographic questions.

Following the State's presentation of evidence, Rush's attorney asked the court to suppress Rush's statements that he "only had one" and that he knew he should not be driving, arguing that Rush was not free to leave the officer's presence when those statements were made. Rush apparently wanted his answers to the demographic questions at jail suppressed too because he had been arrested but not given his *Miranda* warnings when those questions were asked. Rush also asked the court to suppress the evidence from the stop because of the discrepancy between Kossow's and Roach's testimony about which side of the van they pulled up to in order to observe the driver and that the mistake in identity should result in suppression. Finally, Rush argued that the refusal to submit to the breath test should be suppressed because a refusal is now "part and parcel of an aggravated offense" and he was not advised of that, but was simply told that refusal to submit to the test is a separate crime for which he could be charged.

The district court took the matter under advisement and set a date for a ruling on the motions to suppress and the *Jackson v. Denno* issues. See *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964). On August 15, 2012, the court made its ruling and made specific findings of fact and conclusions of law on the record. Rush's attorney then asked the court for a written order with more specific findings of fact, particularly in regard to the statements made. The court ultimately agreed to prepare a written order and withdrew any findings it had previously made pending issuance of the written order.

On September 20, 2012, the district court entered a written order denying all of Rush's motions to suppress. The court found that the officers reasonably believed Timothy was driving the van on a suspended license and therefore lawfully stopped the van. The court found that even though they were mistaken as to the identity of the driver, it was a reasonable mistake of fact based on the officers' observations of the driver and of Timothy's photographs and the fact that the van was registered to Timothy. The court found that upon contacting the driver, it was immediately apparent to Kossow that Rush was extremely intoxicated. The court concluded there was "probable cause" to stop the van and probable cause to arrest Rush, and accordingly, it overruled the motion to suppress evidence.

The district court further found that the statements Rush made upon initial contact with the police and prior to his arrest were freely, voluntarily, knowingly, and intelligently made. The court found that Rush was not in custody when these statements were made and that they were admissible. The court also overruled Rush's motion to suppress most of his statements made after he had been arrested. The court found that no *Miranda* warnings were given after Rush was placed under arrest, and it concluded that, except as set forth further in the order, any statements Rush made in response to questions by the officers should be suppressed. The court found that Rush's statements made that he was refusing to submit to a chemical test were admissible and denied the motion to suppress as to statements made regarding Rush's refusal to submit. The court also found that any statements volunteered by Rush were admissible and overruled the motion as to any volunteered statements, which included belligerent statements made by Rush calling the officers names and a statement he made indicating that he "wanted to go to his cell and pass out." The court found that a review of all of Rush's statements revealed that he had knowledge and understanding of what was said and that his answers were responsive to the officers' questions. The court found that Rush's statements were made without mental confusion, were made with mental appreciation of what was being said, and were not the product of any promises, threats, or coercion. Finally, with respect to the *Jackson v. Denno* issues, the court found that all the statements Rush made on March 10, 2012, were freely, voluntarily, knowingly, and intelligently made.

*Trial Testimony.*

A jury trial was held on November 13 and 14, 2012. The State called both Kossow and Roach to testify, and their trial testimony was generally consistent with the testimony they provided at the suppression hearing.

At trial, Kossow stated that he had been incorrect in testifying at the suppression hearing that the cruiser pulled up to the driver's side of the van, and he stated that the officers had, in fact, pulled along the passenger side of the van. According to Kossow, he had not been certain of

- 4 -

this detail, since it was not a detail he had included in his report, but after discussing it with Roach after the suppression hearing and revisiting the area, he subsequently concluded that he had been wrong in his suppression hearing testimony.

Kossow testified more extensively about the field sobriety tests he administered to Rush. One of the tests Kossow administered was the horizontal gaze nystagmus test, and he explained how that is done. Kossow stated that there are a total of six clues to look for, three in each eye, those being lack of smooth pursuit, onset of nystagmus prior to 45 degrees, and nystagmus at maximum deviation. Kossow observed all six clues when testing Rush. Kossow explained and demonstrated the "one-leg stand" to Rush, and he observed indicators of impairment in that test. Next, Kossow explained the "nine step walk-and-turn" test and again demonstrated it to Rush. Rush showed numerous signs of impairment on that test as well. Finally, Kossow explained and demonstrated the "Rhomberg balance test," where the subject stands with his hands at his sides, tips his head back a bit, closes his eyes, and estimates the passage of 30 seconds, and after estimating 30 seconds, the subject is to open his eyes and let the officer know he has finished. According to Kossow, Rush understood the instructions and agreed to this test. Kossow observed that Rush swayed about while he stood in place and that his estimate of 30 seconds was actually 50 seconds. Based on his observations of Rush up to that point, including Rush's performance on the field sobriety tests, Kossow concluded that Rush was under the influence of alcohol.

Kossow again testified that Rush was argumentative during the whole process at the jail, tried to get up and leave a couple of times, and said that he just "wanted to go to his cell and pass out" and that he was not "blowing" any more. Kossow also stated that Rush tried to slap the tube of the breath test machine out of Roach's hands at least once.

Roach again testified that Rush became belligerent and uncooperative at the jail, refused to take the formal chemical test, and said he just "wanted to go to his cell and pass out." Roach held the breathing tube for the machine up to Rush's mouth for him to blow, and Rush slapped it away, calling the officers names and again stating he would not take the test. Rush's refusal to take the test was noted on the checklist. Because Rush had become essentially unmanageable, the officers then placed him in a cell.

After the State rested, Rush moved for a directed verdict, which was overruled by the district court. Rush did not offer evidence. Following submission of the case, the jury returned guilty verdicts on both charges. The court ordered a presentence investigation, which Rush indicated that he would not cooperate with. The court set a date for enhancement and sentencing.

On December 17, 2012, an enhancement and sentencing hearing was held before the district court. The State offered certified copies of Rush's prior convictions, which the court found sufficient to prove the instant offense was a third-offense DUI refusal, as charged in the information. The court sentenced Rush to 4 to 5 years' imprisonment for the DUI conviction, revoked his license again for 15 years, and sentenced him to a concurrent term of 3 to 3 months' imprisonment for driving on a revoked license, with a 1-year license revocation. Rush subsequently perfected his appeal to this court.

## ASSIGNMENTS OF ERROR

Rush asserts that the district court erred in (1) admitting all evidence seized from him as a result of the investigatory stop, because the stop was unsupported by a reasonable suspicion

based on specific and articulable facts; (2) admitting statements made by him, because such statements were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); (3) failing to make sufficient findings of fact in its order denying his motions to suppress; and (4) admitting evidence that he failed to submit to a breath test, because the postarrest chemical test advisement form did not comply with Neb. Rev. Stat. § 60-6,197(5) (Cum. Supp. 2012) and the policy position set forth in *State v. Turner*, 263 Neb. 896, 644 N.W.2d 147 (2002). Rush also asserts that the evidence was insufficient to sustain his conviction for DUI, third offense, with refusal to submit to a chemical test, because a rational trier of fact could not have found he was under the influence, and that the court erred by imposing excessive sentences.

## STANDARD OF REVIEW

In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error. *State v. Wiedeman*, 286 Neb. 193, ___ N.W.2d ___ (2013). But whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination. *Id.*

In reviewing a motion to suppress a statement based on its claimed involuntariness, including claims that law enforcement procured it by violating the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona, supra*, an appellate court applies a two-part standard of review. *State v. Bauldwin*, 283 Neb. 678, 811 N.W.2d 267 (2012). Regarding historical facts, an appellate court reviews the trial court's findings for clear error. *Id.* Whether those facts meet constitutional standards, however, is a question of law, which an appellate court reviews independently of the trial court's determination. *Id.*

In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Wiedeman, supra*. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

Sentences within statutory limits will be disturbed by an appellate court only if the sentence complained of was an abuse of judicial discretion. *State v. Ramirez*, 285 Neb. 203, 825 N.W.2d 801 (2013). An abuse of discretion takes place when the sentencing court's reasons or rulings are clearly untenable and unfairly deprive a litigant of a substantial right and a just result. *Id.*

## ANALYSIS

*Reasonable Suspicion for Investigatory Stop.*

Rush asserts that the district court erred in admitting all evidence seized from him as a result of the investigatory stop, because the stop of the van he was driving was unsupported by a reasonable suspicion. Rush first argues that the officers' mistaken identification of the driver of

the van as Timothy means that the officers did not have articulable facts upon which to base a reasonable suspicion. Rush also argues that once it was discovered that Timothy was not the driver, the officers no longer had any reasonable suspicion of criminal activity.

A traffic violation, no matter how minor, creates probable cause to stop the driver of a vehicle. *State v. Magallanes*, 284 Neb. 871, 824 N.W.2d 696 (2012). Probable cause for a traffic stop merely requires that the facts available to the officer would cause a reasonably cautious person to believe that the suspect has committed an offense; it does not demand any showing that this belief be correct or more likely true than false. *State v. Au*, 285 Neb. 797, 829 N.W.2d 695 (2013). The U.S. Supreme Court has long held that under the Fourth Amendment, a police officer who lacks probable cause but whose observations lead him reasonably to suspect that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to investigate the circumstances that provoke suspicion. *Id*. Reasonable suspicion entails some minimal level of objective justification for detention, something more than an inchoate and unparticularized hunch, but less than the level of suspicion required for probable cause. *Id*.

An investigative stop is limited to brief, nonintrusive detention during a frisk for weapons or preliminary questioning. *State v. Lamb*, 280 Neb. 738, 789 N.W.2d 918 (2010). While this type of encounter is considered a "seizure" and invokes Fourth Amendment safeguards, because of its less intrusive character, this type of encounter requires only that the stopping officer have specific and articulable facts sufficient to give rise to reasonable suspicion that a person has committed or is committing a crime. *Id.* An investigatory stop and resulting inquiry must be reasonably related in scope to the justification for their initiation. *State v. Au, supra*. Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. *Id*. See, also, *State v. McGinnis*, 8 Neb. App. 1014, 608 N.W.2d 605 (2000).

We agree with the district court's conclusion that the officers had a reasonable and articulable suspicion that Timothy was operating a motor vehicle on a suspended license and therefore lawfully stopped the van. An investigatory stop was justified to allow Kossow and Roach to investigate their reasonable suspicion that Timothy was driving the van. Because the purpose of an investigative stop is to clarify ambiguous situations, even when it is equally probable that the vehicle or its occupants are innocent of any wrongdoing, police must be permitted to act before their reasonable belief is verified by escape or fruition of the harm it was their duty to prevent. See *State v. Bowers*, 250 Neb. 151, 548 N.W.2d 725 (1996). Both officers testified that they looked at the driver of the van, compared their observations to the two photographs of Timothy they had available, and concluded that the driver was Timothy. These observations, coupled with the fact that the van was registered to Timothy, whose license was suspended, provided the officers with sufficient reasonable suspicion to stop the van to investigate further.

Once the officers lawfully stopped the van, they immediately discovered that Timothy was not driving the van. That discovery dispelled their reasonable suspicion that Timothy was driving the van while his license was suspended. However, that is not the end of the inquiry in this case, as additional circumstances led to the continued investigation. First, the driver of the van did not immediately pull over despite the officers' having activated their cruiser's overhead

lights and siren. Second, and more important, it was immediately apparent to the officers that the driver of the van, albeit not Timothy, was intoxicated. The articulable facts which support this conclusion were the strong odor of alcohol coming from Rush, as well as his slurred speech, watery and bloodshot eyes, and extreme confusion. Thus, the officers were faced with reasonable suspicion that the driver of the van was involved in criminal activity beyond that which initially justified the stop. See, *State v. Au*, 285 Neb. 797, 829 N.W.2d 695 (2013); *State v. Lamb, supra*. An officer is required to have only a reasonable, articulable suspicion that a motorist was driving under the influence in order to expand the scope of the initial traffic stop and detain him or her for field sobriety tests. *State v. Lamb*, 280 Neb. 738, 789 N.W.2d 918 (2010). We conclude that the officers had a reasonable, articulable suspicion that Rush was driving under the influence and were thus justified in expanding the scope of the initial traffic stop in order to perform field sobriety tests. It was also lawful at that point for the officers to detain Rush while checking his license. See *State v. Holman*, 221 Neb. 730, 380 N.W.2d 304 (1986). The results of the field sobriety tests further justified administering the PBT and ultimately placing Rush under arrest for DUI. Under the circumstances of this case, the district court did not err in overruling the motion to suppress evidence resulting from the investigatory stop.

*Suppression of Rush's Statements.*

Rush asserts that the district court erred in admitting statements made by him, because such statements were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). When a person is in custody and interrogated by government officials, *Miranda v. Arizona* requires the now-familiar set of warnings regarding the right to remain silent, that statements may be used as evidence against the person, and the right to an attorney. See *State v. Bauldwin*, 283 Neb. 678, 811 N.W.2d 267 (2012). "Interrogation," under *Miranda v. Arizona*, refers not only to express questioning, but also to any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect. *State v. Bauldwin, supra*.

Rush argues that the statements he made during his initial contact with the police should have been suppressed as custodial interrogation without the benefit of the *Miranda* warnings. Specifically, Rush argues his statements that he had only "one" and that he knew he did not have a license were the product of unlawful custodial interrogation. Rush points to the testimony of the officers that he was not free to leave at the time he made these statements.

The *Miranda* procedures were not meant to preclude law enforcement personnel from performing their traditional investigatory functions such as general on-the-scene questioning. *State v. Holman*, 221 Neb. 730, 380 N.W.2d 304 (1986); *State v. Bennett*, 204 Neb. 28, 281 N.W.2d 216 (1979). In on-the-scene investigations, the police may interview any person not in custody and not subject to coercion for the purpose of determining whether a crime has been committed and who committed it. *Id*. Further, roadside questioning of a driver detained pursuant to a routine traffic stop does not constitute custodial interrogation for purposes of *Miranda*. Instead, there must be some further action or treatment by the police to render a driver in custody and entitled to *Miranda* warnings. *State v. Holman, supra*; *State v. Brauer*, 16 Neb. App. 257, 743 N.W.2d 655 (2007). In *State v. Brauer*, the defendant was initially stopped for a traffic violation. Upon contact with the defendant, the law enforcement officer detected an odor of

alcohol, and the defendant acknowledged having been drinking. The officer placed the defendant in the cruiser to conduct on-the-scene investigation and questioning, based on his reasonable, articulable suspicion that the defendant might have been driving while intoxicated. This court concluded that the trial court did not err in denying the defendant's motion to suppress his statements made during this investigation. *Id.*

The statements Rush complains of all occurred at the time of the investigatory stop and fall within the context of on-the-scene roadside questioning as part of the investigatory stop. Because those statements were made in the process of an investigation to determine whether criminal activity was afoot, the statements were not custodial and *Miranda* warnings were not required. Rush's argument is without merit.

*Findings of Fact in Suppression Order.*

Rush asserts that the district court erred in failing to make sufficient findings of fact in its order denying his motions to suppress.

Starting with *State v. Osborn*, 250 Neb. 57, 547 N.W.2d 139 (1996), the Nebraska Supreme Court has required district courts to articulate in writing or from the bench their general findings when denying or granting a motion to suppress. The court noted that the degree of specificity in doing so would vary from case to case depending on the facts of each case. See *id.*

In this case, the district court found in its order that the statements made by Rush "upon initial contact and prior to his arrest were freely, voluntarily, knowingly and intelligently made"; that Rush was not in custody when these statements were made; and that these statements were admissible. The court then proceeded to consider the statements made by Rush after he was arrested. The court found that the statements Rush made that he was refusing a chemical test were admissible, as were his volunteered statements, including the name calling and his comment that he "wanted to go to his cell and pass out." The court concluded, however, that any statements made by Rush in response to questions of the officers should be suppressed. The court's findings with respect to the statements made by Rush were in compliance with *State v. Osborn* and of sufficient specificity to allow appellate review of the court's decision. Rush's assignment of error is without merit.

*Wording of Advisement Form.*

Rush asserts that the district court erred in admitting evidence that he failed to submit to a breath test, because the postarrest chemical test advisement form did not comply with § 60-6,197(5) and the policy position set forth in *State v. Turner*, 263 Neb. 896, 644 N.W.2d 147 (2002).

Section 60-6,197(5) provides:

Any person who is required to submit to a chemical blood, breath, or urine test or tests pursuant to this section shall be advised that refusal to submit to such test or tests is a separate crime for which the person may be charged. Failure to provide such advisement shall not affect the admissibility of the chemical test result in any legal proceedings. However, failure to provide such advisement shall negate the state's ability to bring any criminal charges against a refusing party pursuant to this section.

*State v. Turner, supra*, provides that the right of a person suspected of DUI to refuse a chemical test is a matter governed purely by statute. It further provides that under § 60-6,197, a person

arrested for DUI must be advised that refusal to submit to a chemical test is a separate crime for which the person may be charged, but he or she need not be advised of any additional consequences of a refusal to submit to a chemical test.

The advisement read to Rush informed him: "Refusal to submit to such test or tests is a separate crime for which you may be charged." The advisement given Rush clearly complies with the statutory requirements of § 60-6,197(5). Rush tries to draw a distinction between being advised that he could be charged with a separate crime and being advised that he could be charged with an additional or enhanced crime.

Rush was charged in the Information with "DUI - with Refusal of Chemical Test (2 prior convictions)" pursuant to §§ 60-6,196 and 60-6,197.03(6), a Class IIIA felony. Section 60-6,197.03 provides that any person convicted of a violation of § 60-6,196 or § 60-6,197 (DUI) shall be punished as follows:

> (6) If such person has had two prior convictions and, as part of the current violation, . . . refused to submit to a test as required under section 60-6,197, such person shall be guilty of a Class IIIA felony, and the court shall, as part of the judgment of conviction, revoke the operator's license of such person for a period of fifteen years from the date ordered by the court . . . .

Thus, Rush was charged with the combined offense of DUI and refusal to submit, which was an enhanced charge due to his two prior convictions. Rush argues that because this statute contains a greater penalty as a result of recidivism, it is an "additional" crime, not a separate crime or an additional consequence. Essentially, Rush asserts that he should have been informed that failure to submit to the breath test would result in a combined DUI/refusal offense and that such refusal would be an aggravated offense due to his prior convictions.

We find no merit in Rush's argument. There is no basis in either § 60-6,197(5) or case law to require that a defendant be informed of the additional consequence of a refusal to submit due to having prior convictions. The fact that Rush's refusal to submit led to the combined charge of DUI, third offense, with refusal to submit, does not render the advisement given in this case incorrect.

*Sufficiency of Evidence.*

Rush asserts that the evidence was insufficient to sustain his conviction for DUI, third offense, with refusal to submit to a chemical test, because a rational trier of fact could not have found that he was under the influence.

In arguing this assignment of error, Rush points to the fact that there were no observed traffic violations prior to the stop and that the van was stopped because the officers thought Timothy was driving it on a suspended license. Rush suggests that multiple reasons could exist for his failure to immediately stop the van, his slurred speech, his watery and bloodshot eyes, the odor of alcohol, and his performance on the field sobriety tests.

The relevant question for this court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Wiedeman*, 286 Neb. 193, ___ N.W.2d ___ (2013). Rush was able to, and did, present evidence regarding these alternative explanations to the jury, which apparently rejected them. There was sufficient evidence presented to support a

finding beyond a reasonable doubt that Rush was operating a motor vehicle while under the influence of alcoholic liquor and that he refused to submit to a chemical test. This assignment of error is without merit.

*Excessive Sentences.*

Rush asserts that the district court erred by imposing excessive sentences. The jury found Rush guilty of DUI, third offense, with refusal to submit to a chemical test, a Class IIIA felony, and driving during revocation, a Class II misdemeanor. See, § 60-6,196; § 60-6,197.03(6); § 60-4,108(1)(a). The court sentenced Rush to a term of 4 to 5 years' imprisonment for the DUI/refusal conviction and to a concurrent term of 3 to 3 months' imprisonment for the driving during revocation conviction. The court also revoked Rush's license for 15 years and gave him credit for 223 days served.

Pursuant to Neb. Rev. Stat. § 28-105 (Cum. Supp. 2012), a Class IIIA felony is punishable by up to 5 years' imprisonment, a $10,000 fine, or both. Pursuant to Neb. Rev. Stat. § 28-106 (Cum. Supp. 2012), a Class II misdemeanor is punishable by up to 6 months' imprisonment, a $1,000 fine, or both. Rush's sentences were all within the statutory range. And as noted above, an appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Ramirez*, 285 Neb. 203, 825 N.W.2d 801 (2013). When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime. *State v. Watt*, 285 Neb. 647, 832 N.W.2d 459 (2013). The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id.*

Rush was 52 years old at the time of the crimes in this case. He has an 11th grade education. Rush has a lengthy criminal history, dating back to 1982. It includes convictions for theft (three times), shoplifting, disturbing the peace (twice), trespass, assault, DUI (three priors), and a refusal to submit. Rush refused to participate in the presentence investigation, but the limited information he provided indicated that his longest period of employment was 5 years--he is currently unemployed due to being in jail. No risk assessment evaluation was conducted because of Rush's refusal to participate.

The record shows that the district court considered the relevant factors in sentencing Rush. We find no abuse of discretion in the sentences imposed.

CONCLUSION

The district court did not err in overruling Rush's motions to suppress and made sufficient findings of fact in connection with the suppression order. Because the postarrest chemical test advisement form read to Rush complied with statutory requirements, the district court did not err in admitting evidence that Rush failed to submit to a breath test. The evidence was sufficient to sustain Rush's DUI conviction, and the court did not impose excessive sentences.

AFFIRMED.